## CRESSWELL *v.* CRESSWELL.

(Division B.  March 28, 1932.  Suggestion of Error Overruled, November 28, 1932.)

[140 So. 521.  No. 30041.]

(Division A.  Oct. 31, 1932.)

[144 So. 41.  No. 30041.]

See, also, 140 So. 521.

Campbell & Campbell, of Yazoo City, for appellant.

Montgomery & Montgomery, of Belzoni, for appellee.

**Griffith, J.**, delivered the opinion of the court.

At the December, 1929, term of the chancery court of Yazoo county, this case was set for hearing in vacation by a formal order entered to that effect. On the day so

set, to-wit, on January 9, 1930, the chancellor heard the case, and thereupon entered a further order taking it under advisement. On July 30, 1930, the chancellor sent to the solicitors a written opinion, and directed that a decree in accordance therewith be prepared and forwarded to him. On August 2, 1930, the solicitors for appellee furnished to the solicitors of the opposing side a copy of the proposed decree, and the original was on that day forwarded to the chancellor. The chancellor signed the decree on August 19, 1930, but did not deliver it to the clerk until August 27, 1930. Appeal bond for an appeal from the decree was filed by appellant on February 20, 1931, and appellee has filed herein a plea in bar of the appeal, on the ground, as appellee contends, that the appeal was not taken "within six months next after the rendition of the judgment or decree complained of." Section 2323, Code 1930. The question for decision is whether the decree was rendered on August 19th, the date of the signing of the decree by the chancellor, or whether on August 27th, the date when the written decree was by him delivered to the clerk for entry.

In courts of law the date of the rendition of the judgment is the date "when the court signifies its assent to the sentence of the law as the result of proceedings in the case." Clark v. Duke, 59 Miss. 575, 579. In the law courts, the judgment is pronounced by the court orally in the presence of the clerk, and the clerk is thereupon authorized forthwith to enter the judgment upon the minutes. No signed order by the judge to the clerk is necessary, except as otherwise provided in special instances; and hence in ordinary cases the date of the rendition of a judgment at law is the pronouncement thereof by the court at the conclusion of the trial. Simpson v. Boykin, 118 Miss. 701, 718, 79 So. 852.

But in the chancery court, because of the elaborate and flexible character of the decrees rendered therein, the contents of the decrees and decretal orders are not,

and cannot be, intrusted to the clerk, but must first be drawn up in writing by the solicitors or by the chancellor and signed by the chancellor, Howard v. Jayne, 124 Miss. 65, 86 So. 752; and, until thus drawn up, signed by the chancellor, and by him in this form delivered to the clerk, there is no authority to the clerk to enter the decree on the minutes. We think the logic of the law is to the effect that a judgment or decree is rendered when, and only when, the clerk is authorized to enter it on the minutes. We therefore concur in the statement found in 2 R. C. L., p. 107, as follows: ''Where the statute provides that appeals shall be taken within a certain time from the rendition of the judgment, order or decree, the date of the judgment, order or decree is not necessarily the date of its rendition, and where an order, after signature, remains in the possession of the judge unannounced and unpublished until he files it with the clerk, the time of filing will be considered the time of rendition and not the time of its date and signature by the judge.'' See, also, Peterson v. Nash, 50 C. C. A. 260, 112 Fed. 311, 55 L. R. A. 344. Under our jurisprudence in chancery the only manner in which the chancery court or chancellor can, with valid and consummated effect, announce, publish, or render a decree is to sign it and deliver the same to the clerk. It is of some interest to note that this holding in respect to final decrees harmonizes with the statute, section 14, Code 1930, on the subject of appeals from interlocutory decrees. Our conclusion is that the appeal in this case was taken in time, and that the plea in bar is insufficient in law.

So ordered.

**McGowen, J.**, delivered the opinion of the court on the merits.

An original bill was filed by the appellee, Mrs. Mary Jane Cresswell, against E. M. Cresswell, seeking to cancel a certain deed to land executed by her to E. M. Cress-

well. A demurrer to this bill was sustained, and an amended bill was filed, answer made thereto, issue joined, and, upon hearing the evidence, the court sustained the prayer of the bill and canceled the deed in question, from which an appeal is prosecuted here.

The bill now before the court alleged, in brief, that Mrs. Mary Jane Cresswell executed a deed to her grandson, the appellant, E. M. Cresswell, for a recited consideration of ten dollars and love and affection, with his oral agreement, not mentioned in the deed, that he live with, and care for, her in her old age, and that in a short time after procuring the deed he ceased to live with her as he had agreed to do, and that because of his fraud and undue influence her deed, which was a gift inter vivos, was voidable at her election. The deed had retained in Mrs. Cresswell a life estate, with remainder to her grandson, E. M. Cresswell. She further alleged that she was mentally weak and very old.

The answer denied that there was any promise to live with and care for her, and averred that the land in question was conveyed to him by his grandmother for other reasons.

The essential facts in this case are these: Mrs. Mary Jane Cresswell was a widow, and owned the small farm on which she lived. She was present when her grandson was born, partially reared him, as he for the most part lived with her, and until his marriage evidently they possessed a mutual affection each for the other. In 1922 the appellant married, and Mrs. Mary Jane Cresswell thereupon offered to, and did, vacate her home, and permitted him and his wife to reside in and have the use of her home, and of the household effect, going to the home of her son, the father of the appellant. In a short time she became dissatisfied, and besought the appellant and his wife to permit her to return and live with them, to which they readily assented. At the close of the year, the grandson, E. M. Cresswell, removed to lands nearby,

which he leased from his father, and there lived for some time. But in December, 1926, Mrs. Mary Jane Cresswell desired that her grandson and his wife should return to her house and live with her. Accordingly they moved back. E. M. Cresswell had just gotten up from bed—a case of tuberculosis. Mrs. Mary Jane Cresswell was then eighty-two years of age, feeble in body, suffering from a heart affection, and she thought that she required the attendance of some one in the house, especially at night, as she had spells. In order to induce her grandson to live with her and care for her, she proposed to will to E. M. Cresswell the real property which she then owned, and on which she lived. Her testimony is that he was not willing for this to be done, insisting that a will could be broken; that his father might break her will. But, according to her testimony, he agreed to live with her if she would make him a deed to the land, retaining a life interest thereto in herself. Thereupon the grandson and his wife lived with Mrs. Cresswell from about the 1st of December until the last of March.

The circumstances contended with the execution of the deed are as follows: E. M. Cresswell carried his grandmother of Yazoo City, to the law firm of Bridgeforth & Wise, where she executed the deed now sought to be canceled. Mrs. Cresswell says that she did not understand the words "love and affection;" she thought they meant his love for her as well as for her love for him, and that he would live with and take care of her. In a short time after the execution of the deed, in the absence of her grandson, Mrs. Mary Jane Cresswell complained because of the small number of biscuits cooked by her grandson's wife for a certain meal, and they had some disagreement about the matter. According to her testimony, when the matter was reported to her grandson, she insisted that it did not amount to anything; that she desired that they continue to live with, and care for, her.

In addition to the farm involved here, and the produce derived therefrom, Mrs. Cresswell had about eight hundred dollars in the bank, and received a pension amounting to from one hundred eight dollars to one hundred forty-four dollars a year. It is quite plain that she was a frugal woman, not requiring the expenditure of much money for her to live on the farm; and it is not contended that by the care of her she meant that her grandson should pay any of her living expenses. She never had called upon him to transact any business for her. In fact, no witness has shown that there was ever any business transaction between them save the one involved in the case at bar, and a small loan she made to him on one occasion. She said that she would seek his judgment about a business transaction, and, in effect, that she would follow his advice if it happened to suit her; that she thought she "ruled the roost." She testified that she was not advised by Bridgeforth & Wise as to the effect of her deed, but that the lawyer who drew the instrument seemed to understand from their conversation what they wanted. She contradicted the lawyer and her grandson by saying that the deed was in "full bloom" and "operation" when she got to the lawyers' office, and that she did not advise with the lawyer, or with any one else, apart from her grandson. She was positive that her grandson agreed to live with and care for her, and positive that she did not request him to leave after the disagreement between them, but that he was angry, and two or three months after the deed was executed, over her protest, moved to a place he had provided for himself, within calling distance from the house occupied by Mrs. Cresswell. The lawyer, Mr. Wise, member of the firm of Bridgeforth & Wise, thought she fully understood the terms of the deed. She further testified that, after her grandson refused to live with her, she offered him one hundred dollars to reconvey the land to her, which he declined to do, demanding five hundred dollars for a reconveyance.

The appellant, E. M. Cresswell, said he had never employed a lawyer before, and that his grandmother had voluntarily offered to make the deed to him as a matter of justice, because she had renounced his grandfather's will, in which he was named a beneficiary; that it was her proposition to make the deed to him; that he intended to live with, and care for, her, although that was not the condition of the execution of the deed; and that he left the premises of his grandmother because she requested it. He admits that after he had made arrangements to leave she insisted upon his remaining. She described his taking care of her as "getting firewood, feed chickens, go to market and buy little things, and live, as near as they could, like one family."

It is evident that Mrs. Cresswell desired her grandson to live with her because she wanted some one with her at night; that she had great affection for this grandson.

On October 14, 1927, Mrs. Cresswell filed her bill to cancel this deed. Subsequently she died, but before her death her deposition had been taken, and her testimony as to the facts, from her standpoint, are before the court.

The appellant, E. M. Cresswell, the grandson, contradicted his grandmother as to the reason for the execution of the deed, and as to the reason for his leaving her home, each claiming a different reason for the separation:

Subsequent to the grandson's removal to the home of his grandmother, Mrs. Americus Ward, the daughter of Mrs. Cresswell, and who lived with her, upon the death of Mrs. Cresswell made herself a party to the bill as administratrix and in her own behalf, claiming the land by virtue of a will executed in her favor, devising this land, to her, after she had gone to live with her mother.

Of course, the burden of proof is upon the party alleging fraud or undue influence to prove the same.

There being no proof of fraud, no actual undue influence, the appellee here relied upon the well-known rule that, where a fiduciary relation exists between par-

ties, and a deed is executed from the subservient to the dominant party, there is a presumption that it is invalid as between the parties sustaining that relation at the instance of the grantor, and that generally it requires evidence of full knowledge and competent independent advice to the grantor. This rule and the burden of overcoming the presumption of invalidity between the parties because of such relationship was discussed in the case of Ham v. Ham, 146 Miss. 161, 110 So. 583.

The only question in this case is: Do the facts which we have detailed constitute a confidential relation between the parties, such as would call for an application of the rule above set out? Of course, in cases arising between principal and agent, attorney and client, physician and patient, there is no difficulty in determining that such relationship is confidential between them. What are confidential relations? In the case of Central National Bank v. Ins. Co., 104 U. S. 54, 68, 26 L. Ed. 693, the Supreme Court of the United States, in discussing fiduciary relationships, quoted from an English case, Pennell v. Deffell, 4 DeG. M. & G. 372, as follows: "It [a fiduciary relation] is one in which, if a wrong arise, the same remedy exists against the wrongdoer on behalf of the principal as would exist against a trustee on behalf of the cestui que trust."

In other words, this definition, applied to the case at bar, would mean that E. M. Cresswell's relation to his grandmother, Mrs. Mary Jane Cresswell, was that of a trustee to a cestui que trust. There was no evidence of any business relations between the grandson and his grandmother. They had lived together the greater part of the grandson's life, until his marriage in 1922. He never transacted any business for her, never exercised any dominion over her in any way, except, as the chancellor has found, he made her an oral promise to live with and care for her; and he breached that promise. Does that constitute confidential relations of a nature

to raise the presumption resorted to by courts of equity in aid of a complaining party? Mrs. Mary Jane Cresswell retained for herself a life interest in the property. She did not part with the possession of any of her property until her death, but she irreconcilably undertook to part with her title. She was eighty-two years of age, and suffered from weakness of body, superinduced by age and heart disease; but she nowhere testifies to any fact indicating that she was overreached in any way, except that she executed a deed after having heard it read, or reading it herself, relying upon her grandson's oral promise aliunde the deed to care for and live with her, which promise he violated. There is no question but that the dictates of human sympathy would say that the grandson, not having parted with anything by reason of his acceptance of the deed, when his grandmother became dissatisfied because he had ceased to carry out his oral agreement to live with and care for her, should have reconveyed the land to her as freely as she had conveyed it to him; but as much might be said of any such voluntary conveyance, and remembering that persons of sound mind, except those under twenty-one years of age, and those who have been overreached, must abide the consequences of their solemn, deliberate acts, equity cannot require cancellation and rescission.

The Ham case is no authority save for the announcement of the rule as to the presumption of fraud in deeds between parties sustaining a fiduciary relation, which is not to be disputed, and which this court will preserve inviolate. There was no difficulty in the Ham case in the way of the relationship of these two brothers, because they were business partners. It was a bargain and sale, and the sick and dying brother was presumptively overreached by the brother who was in good health, and who managed the business. The grantee had a strong and intense affection for the grantor. The grantee was the moving spirit in looking after his brother

and in the management of their business; and the grantor relied on his brother as his business partner and beloved brother. This court held that not only a conventional relation existed because of the partnership, but went further, and announced that these facts actually showed confidential, fiduciary relations between the Hams at the time of the execution of the instrument that the grantor had no independent advice by a competent person, disconnected from the grantee, and devoted wholly to the grantor's interest, and applied the presumption that the deed was invalid and voidable.

The burden of proof is upon one who claims the invalidity of a deed, because of confidential or fiduciary relations, to establish such relations.

The presumption of fraud or undue influence arises when and if the grantor establishes the fiduciary relation as existing between the parties at or before the time of the execution of the instrument sought to be invalidated. This presumption does not arise because of blood relationship accompanied by affection between the parties. See 18 C. J., p. 424, sec. 503.

The deposition of the grantor in this case does not indicate mental weakness, so far as her ability to take care of her interests is concerned. The fact is that the complainant now prosecuting this suit claims under a will executed by Mrs. Cresswell subsequent to the date of the deed here in controversy. On the facts of this case we do not think the appellee established fiduciary relations between the parties; nor were fraud, oppression, undue influence, coercion, or overreaching established without the aid of the presumption applied in the Ham case. The fiduciary relations are not shown, but, on the other hand, are negatived by all the evidence. There is no showing from which the relations of cestui que trust and trustee could be assumed in the case at bar.

Reversed and remanded.