SAULSBERRY, et al. *v.* SAULSBERRY, et al.

No. 40664 February 24, 1958 100 So. 2d 593

*Jas. Stone & Sons,* Oxford; *R. F. B. Logan,* Hernando, for appellant.

*Chatham & Walker,* Hernando, for appellee.

KYLE, J.

This case is before us on appeal by Simon Saulsberry and others, complainants in the court below, from a decree of the Chancery Court of DeSoto County dismissing after a hearing upon its merits the bill of complaint filed by them against Johnie Saulsberry and Lizzie Saulsberry, defendants in the court below, seeking to establish an implied trust in favor of the complainants and the estate of Mose Saulsberry in a tract of land conveyed to the defendants by Mose Saulsberry a short time before his death.

This is the second time this case has been before us on appeal. See Saulsberry v. Saulsberry, 223 Miss. 684, 78 So. 2d 758. On the former appeal this Court reversed the decree of the chancellor sustaining a general demurrer to the bill of complaint, and remanded the cause. After the filing of the mandate in the court below the complainants filed their third amended bill of complaint, in which James P. Tipton, Administrator C. T. A. of the Estate of Mose Saulsberry, deceased, was named as one of the complainants.

In their third amended bill of complaint the complainants alleged that Mose Saulsberry and his wife, on October 18, 1952, conveyed to Johnie Saulsberry and his wife, Lizzie Saulsberry, 170 acres of land situated in DeSoto County, Mississippi, which constituted a part of the 360 acres of land devised by Mose Saulsberry to Johnie Saulsberry and others in Item 4 of his will dated October 16, 1939; that the said deed of conveyance contained a general warranty of title, and the consideration stated therein was $3150, paid in cash, and other good and valuable considerations; and that the said Johnie Saulsberry and his wife on the same date executed a

deed of trust on said land to the Federal Land Bank of New Orleans for the purpose of securing the payment of a note for the sum of $3315, bearing interest from the date thereof until paid at the rate of four per cent per annum. The bill of complaint further alleged that the real contract between Mose Saulsberry and his wife, and Johnie Saulsberry and his wife, for the purchase of the 170 acres of land was as follows: That Mose and his wife were to make a gift to Johnie and his wife of 40 acres of the land, and that Johnie and his wife were to pay Mose $90 per acre for the remaining 130 acres of the land, or $11,700; that the recited consideration of $3150 was paid upon the delivery of the deed, but no deed of trust on said land or any other security was given by Johnie and his wife to Mose for the balance of the purchase price, which amounted to $8550. The bill further alleged that Johnie Saulsberry had been taken into Mose's home when he was an infant, and had been brought up by Mose as his son; that Mose relied upon Johnie to transact business for him, and confided in and advised with Johnie regarding his business; and that by virtue of the confidential relation that existed between them Johnie had persuaded Mose to execute the deed, and had promised to execute and deliver to Mose a deed of trust for the sum of $8550 to secure the balance of the purchase price of said land; that such promise on Johnie's part was false at the time it was made, and that Johnie never intended to execute and deliver to Mose any such deed of trust; that such conduct on the part of Johnie was a deliberate fraud, and to allow Johnie and his wife to retain possession and title to the land without executing a note and deed of trust for said purchase price, would result in their being unjustly enriched at the expense of Mose's estate. The complainants therefore prayed that the court declare and establish an implied trust in favor of the complainants and the estate of Mose Saulsberry, deceased, in said land for the sum of $8550, and that the defendants be declared

to hold the said land in trust for the estate of Mose Saulsberry subject to the deed of trust given to the Federal Land Bank; that they be required to execute and deliver to the above mentioned administrator a note and deed of trust for said sum of $8550.

The defendants in their answer denied the material allegations of the bill of complaint, and averred that the real contract between the parties was set forth in the deed executed by Mose and his wife to Johnie and his wife on October 18, 1952. The defendants averred that the consideration of $3150 recited in the deed was paid upon the delivery of the deed, and that there was no agreement between the parties that a deed of trust should be executed by Johnie and his wife for any additional sum of money. The defendants denied that Mose relied upon Johnie to transact business for him, or that Mose confided in or advised with Johnie regarding his business affairs, or that Mose was induced to convey the land to Johnie by any false promise of Johnie and his wife to pay any additional amount of money for the land or to execute a deed of trust for any unpaid balance. The defendants denied in toto the allegations of fraud and unjust enrichment set forth in the bill of complaint; and the defendants averred that the complainants were merely disappointed legatees who had no legal or just claims against any part of the property that Mose left except that which he gratuitously gave them in his will.

The cause was heard upon the pleadings and proof at the March 1956 term of the court.

Five witnesses testified on behalf of the complainants. Hattie Morrison, who was a sister of Mose's first wife, Mandy, testified that she lived in Arkansas; that she received a letter from Mr. R. F. B. Logan, one of the complainants' attorneys, a few days after Mose's death concerning the settlement of Mose's estate; and that she came to Hernando to attend a conference in Mr. Logan's office concerning the settlement of the estate. Johnie

Saulsberry was present and Mr. Logan talked to Johnie about the land. Hattie testified that after the conference had broken up, she and the other interested parties talked to Johnie in front of Mr. Logan's office, and Johnie stated to them that Mose gave him 40 acres of land and that he was buying 130 acres of land, and that he was paying $90 an acre for it. Johnie did not say anything about any papers. Johnie did not say that he was going to pay anybody for the land, but he did say that if he had to pay it to anyone, he would pay it to the children who rented the land. Hattie stated that she never had any conversation with Mose about selling the land to Johnie, and that she did not hear Johnie say that he had paid Mose $3150 for the land. Richard Morrison, who attended the conference in Mr. Logan's office, also testified that Johnie said that Mose had given him 40 acres of land and had sold him 130 acres at $90 an acre. Richard stated that after they left Mr. Logan's office and went out on the street, they had a further talk with Johnie. They were trying to obtain a compromise concerning the land he had bought, ''to see if he would be willing to release the 130 acres.'' On cross-examination Richard stated that he visited Mose occasionally. He did not know anything about what the agreement was between Mose and Johnie when Mose sold Johnie the land, other than what he had testified about. Johnie did not tell him that he had paid $3150 for the land.

H. E. Matlock, whose deposition was taken by agreement, testified that he lived in Memphis, but owned a farm at Horn Lake; and that he had known Johnie Saulsberry about 20 years and he knew Mose Saulsberry during his lifetime. He stated that he picked Johnie up on the highway and carried him to Hernando a short time after Mose's death. He asked Johnie if Mose did not give him a piece of property; and Johnie said that he did. He then asked Johnie if he did not buy the piece of property from Mose, and Johnie said that he did. He asked Johnie if he

had paid for it, and Johnie said, "No, sir, but don't nobody have any papers showing that I didn't pay for it." Matlock stated that Johnie did tell him what price he bought the property for. He said he told Johnie not to go down to Hernando; that if he put the matter in court, it would wind up with the others getting it all. Johnie told him that he was not going to throw it in the court, and that was all that Johnie said. Matlock was asked on cross-examination who brought up the conversation about the land. He stated that he did not remember how it came up, but he thought that he asked Johnie about the matter. He stated that Johnie did not tell him that he had paid $3150 for the land, or that he had borrowed $3150 from the Federal Land Bank and paid that to Mose. C. B. Hilderbrand, whose deposition was taken by agreement, testified that he lived at White Haven and had known Mose about 35 years. He was asked if he had ever discussed with Mose the deal that Mose was making with Johnie about the land involved in this suit. His answer was, "Yes, sir, in a way he did." He stated that Mose told him that he had sold Johnie 130 acres of land and had given him a deed to it, but he did not have a deed of trust. He then asked Mose, "Why don't you get the deed of trust on it?" Mose then said, "Well, I will go down there the next day or soon after that." Hilderbrand stated that he asked Mose about the matter two or three times thereafter. On cross-examination Hilderbrand stated that Mose did not tell him what Johnie paid for the land. Hilderbrand admitted that Mose did not volunteer any information, and it was only after he asked Mose about the matter that Mose told him anything. Mose did not tell him that Johnie had borrowed $3150 from the Federal Land Bank and paid that to him. Mose did not tell him that Johnie had promised to pay him anything or that Johnie had promised to give him a deed of trust. Hilderbrand admitted that all he knew about the matter was that after Mose sold Johnie the land, he kept after Mose to get a trust deed. Hilderbrand stated that

Mose was considered a pretty good business man for a Negro up until a year or two before he died.

R. F. B. Logan, attorney, testified that he prepared the will of Mose Saulsberry and also the petition for the probate of the will, which was filed for record on January 27, 1953. He said that he knew that Mose had sold 170 acres of the 360 acres of land. He stated that he asked Johnie about the land, and Johnie said that Mose had given him 40 acres and had sold him 130 acres of land at $90 an acre. Johnie said that Mose said he would give him time to pay for the land—until the Federal Land Bank deed was satisfied. Logan stated that he did not remember anything else that was said about the matter, but Johnie "just left the impression on me that he still owed $90 an acre for 130 acres." On cross-examination Logan admitted that he was Mose's lawyer "some of the time," and that Mose had never said anything to him about Johnie promising to give him any note. J. F. Conger testified that in his opinion the value of the 170 acres on October 18, 1952, was $11,050. It was also stipulated that the appraisal made by the Federal Land Bank at the time Johnie's loan was made showed the normal agricultural value of the land to be $5,100, and the market value, $10,000.

Paul Bowdre, a member of the Hernando Bar, who was called to testify as a witness for the defendants, testified that he wrote the deed of conveyance which Mose Saulsberry and his wife executed to Johnie and his wife on October 18, 1952; that Mose and Johnie came to his office on that date, and Mose told him that he wanted him to prepare a deed to Johnie, and that he wanted to deed Johnie 170 acres of land for $3150. Bowdre stated that Mr. E. H. Wiygul, who was secretary-treasurer of the local National Farm Loan Association and agent for the Federal Land Bank of New Orleans, had previously requested him to examine and pass on the title of the 170 acres. Wiygul told him that Johnie expected to borrow

money from the Federal Land Bank and buy the land from his father. Bowdre stated that when Mose told him what he wanted, he said to Mose, "You don't mean to tell me you are deeding your son this 170 acres for $3150, do you?" Mose said, "I am deeding it to him for $3150." Mose then said, "Lawyer, will you write the deed, just as I am telling you to write it?" Bowdre then said to Mose, "Yes, I will write it just like you tell me to do it." Bowdre stated that Mose told him that Johnie had been better to him than any of his children had been, that Johnie had looked after him and had been taking care of him. Bowdre stated that so far as he could recall Johnie did not say anything while he was in his office. He said that Mose was very positive about what he wanted. He was asked what the condition of Mose's mind appeared to be. His answer was, "Oh, his mind was all right. "

E. H. Wiygul testified that he arranged the loan to Johnie Saulsberry by the Federal Land Bank. The loan was closed in the chancery clerk's office; Johnie and his wife and Mose and his wife were present. Wiygul asked Mose and his wife both whether they understood "this was full payment of this land," and they both said, "Yes, sir, we understand that." Wiygul stated that the proceeds of the loan were endorsed over to Mose Saulsberry, in other words, Mose got the money. James P. Tipton, the chancery clerk, testified that in his opinion the fair market value of the land in 1952 was about $50 an acre.

Johnie Saulsberry was called to testify as a witness in his own behalf. The complainants objected to the testimony on the grounds he could not testify to establish his own defense against the claim of the estate of Mose Saulsberry. The objection was overruled. Johnie testified that he was 55 years old; that he had been reared by Mose and Mandy Saulsberry, and that he had been living on the land continuously as far back as he could remember. Mose had no children of his own; Mandy died

in 1933, and Mose married Josephine in 1934. Mose died in 1953, while he and Josephine were living in Memphis. Johnie stated that when he bought the 170 acres of land from Mose in 1952, Mose and Josephine were living in the house on the 40-acre tract. Johnie stated that Mose gave him 40 acres by word of mouth, and that Mose told him later that he would let him have the 130 acres for $3150. Johnie was asked how that amount was arrived at, and in answer to that question Johnie stated that Mose told him that whatever amount he could borrow would be all right. Johnie went to Hernando to see Mr. Wiygul about how much money he could borrow on the land from the Federal Land Bank. Mr. Wiygul came up there and looked over the land and told Johnie that he would let him have $3150. Johnie told Mose about that, and Mose said it would be all right. Johnie then went back and told Mr. Wiygul, and Mose had the deed prepared by Mr. Bowdre.

Johnie stated that he did not promise to pay Mose anything except the $3150, and that he did not promise to give Mose a mortgage on the land for any other amount. Johnie stated he told Mr. Matlock that he owed some money on the land, but it was the Federal Land Bank that he owed. Johnie stated that he did not tell Mr. Logan that he owed any amount of money on the land, "not as I know of." He stated that Mr. Logan tried to get him to give the land back to the heirs. Johnie stated that Mose never called on him to give him any note or deed of trust on the land, and never made any demand on him for any money.

The chancellor found that there was no proof that Mose Saulsberry was not in possession of his mental faculties up until the time that he died; that there was no evidence in the record that Johnie had tried to get Mose to give him a deed to the land; that the proof showed that Mose agreed to let Johnie have the land for the amount that he could borrow from the Federal Land Bank, there was

no secret or oral agreement of any kind by Johnie and his wife to pay any additional amount of money for the land; and that Mose had a right to let Johnie have the land for the amount that he could borrow from the Federal Land Bank, or to give the land to Johnie if he wanted to do so. And the chancellor ordered that the bill of complaint be dismissed.

The main point argued by the appellants' attorneys as ground for reversal of the decree of the lower court is that the court erred in holding that the evidence in the case did not establish an implied trust in favor of the appellants, either a constructive trust or a resulting trust. But we think there was no error in the chancellor's holding that the evidence was insufficient to establish either a constructive trust or a resulting trust in favor of the appellants.

A constructive trust, as this Court stated in the opinion rendered on the former appeal, is a trust that arises by operation of law against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, to hold and enjoy. 54 Am. Jur., Trusts, Sec. 218. A constructive trust is an appropriate remedy against unjust enrichment. Ibid., Sec. 219. The mere failure to perform an agreement does not raise a constructive trust, but a breach of an agreement or promise may, in connection with other circumstances, give rise to such a trust. A distinction exists between the breach of a promise not fraudulently made and the breach of a promise made with no intention of performing it. Ibid., Sec. 221.

"Resulting trusts * * * are those which arise where the legal estate in property is disposed of, conveyed, or transferred, but the intent appears or is in-

ferred from the terms of the disposition, or from the accompanying facts and circumstances, that the beneficial interest is not to go or be enjoyed with the legal title. In such case a trust is implied or results in favor of the person for whom the equitable interest is assumed to have been intended, and whom equity deems to be the real owner.'' Pomeroy's Equity Jurisprudence, Vol. 4, Fifth Edition, p. 62, par. 1031.

(Hn 3) This Court held on the former appeal that the facts alleged in the second amended bill of complaint were sufficient, if proved, to make out a case of constructive trust. The case is now before us on the facts developed by the testimony of the witnesses; and after a careful reading of the record, we think the appellants failed to prove by clear and convincing evidence the facts alleged in their bill as facts giving rise to a constructive trust. There is no substantial evidence in the record to support the appellants' charges of fraud on the part of Johnie Saulsberry in the procurement of the deed of conveyance of the 170 acres of land, or to support the charge that Johnie made an oral promise to Mose to execute a note and a deed of trust for an alleged unpaid balance of $8550 still due on the purchase price of the land, which he had no intention of performing, as alleged in the bill of complaint. Hattie Morrison and Richard Morrison testified that they knew nothing about Mose's business affairs, and had never had any conversation with Mose about the sale of the land to Johnie. Mr. Hilderbrand testified that Mose did not tell him that Johnie had promised to pay him anything or that Johnie had promised to give him a deed of trust on the land. Hilderbrand's testimony indicates that it was he, and not Mose, who was interested in having Johnie execute a deed of trust to Mose. Mr. Logan testified that Mose had never said anything to him about Johnie having promised to give him a note for an unpaid balance of the purchase price of the land. Paul Bowdre and E. H.

Wiygul, on the other hand, testified positively that Mose stated to them that he was conveying the land to Johnie for the sum of $3150, which was the amount the Federal Land Bank had agreed to let Johnie have on the land.

Nor is there any proof in the record to show an abuse of confidence by Johnie in the procurement of the deed. There is in fact no proof that a confidential relationship existed between Mose and Johnie, as that relationship has been defined in the decisions of this Court. Cresswell v. Cresswell, 164 Miss. 871, 140 So. 521; Summer v. Summer, 224 Miss. 273, 80 So. 2d 35; Lipe et al. v. Souther et al., 224 Miss. 473, 80 So. 2d 471. None of the appellants' witnesses testified that Mose relied upon Johnie to transact business for him, or that Mose confided in or advised with Johnie regarding his business affairs, or that Johnie had any part in the management of Mose's business. The record shows, on the other hand, that Mose managed his own business affairs and continued to manage his own business up until the time of his death. It is true that Johnie had been taken into Mose's home when he was an infant, and had been brought up by Mose as his son; and all of the witnesses testified that Johnie had been good to Mose, and that Mose had an affectionate feeling for Johnie. But this Court held in Cresswell v. Cresswell, supra, that a presumption of fraud does not arise because of blood relationship accompanied by affection between the parties. The relationship of parent and child, grandparent and grandchild, or brother and sister, is not intrinsically one of confidence; and even though a fiduciary relationship be proved, a constructive trust does not arise in a case of this kind unless there is also proof of an abuse of the confidence imposed. Summer v. Summer, supra; Lipe et al. v. Souther, et al., supra. The appellants' testimony in this case failed to show that Johnie was guilty of any abuse of confidence.

The appellants' attorneys argue, however, that the purchase price of $3150 which was paid by Johnie was

much less than the fair market value of the land in 1952; that the deed recited a consideration of $3150 "and other good and valuable considerations receipt of which is hereby acknowledged," thereby indicating that there were other considerations for the execution of the deed; and that Johnie's statements to Mr. Matlock on the road to Hernando, and to Mr. Logan and two or three of the other witnesses who were pressing Johnie for a "compromise" or a release of the 130 acres, were sufficient to show that Johnie had made some kind of promise to Mose to pay an additional sum of money for the land.

But we think there is no merit in any of these contentions. Mr. Bowdre stated that he put the words, "and other good and valuable considerations," in the deed for the reason that he thought there might be a good consideration there from what Mose told him about the boy, "that the boy had taken care of him and had been so good to him." Mr. Bowdre said, "That is the reason I put that in there." It may be conceded that the statements made by Johnie to Mr. Logan and Hattie and Richard Morrison which were offered in evidence as admissions against interest, if considered by themselves, might be considered as indicative of some sort of oral promise made by Johnie to pay Mose $90 per acre for the 130 acres of land. But those statements, alleged to have been made by Johnie four months after the deed was executed, were wholly insufficient to overcome the formal recitals of the deed and Mose's own statement to Mr. Bowdre at the time he had the deed prepared that he was selling the land to Johnie for $3150, and Mose's own statement to Mr. Wiygul at the time he received the money that the $3150 was full payment for the land. Moreover, this Court has refused to sanction the doctrine that an enforceable trust will arise from the mere breach of an oral promise, however solemn, to hold in trust. "There must be conduct influential in producing the result, and but for which such result would not have oc-

curred, amounting, in the view of a court of equity, to fraud, to save the case from the statute of frauds. A merely oral promise, and its subsequent breach, however disappointing and harmful, and though ever so reprehensible in morals, is not of itself enough to cause a court of chancery to declare a trust." Ragsdale v. Ragsdale, 68 Miss. 92, 8 So. 315; Coleman et al., v. Kierbow, 212 Miss. 541, 54 So. 2d 915.

Mose had a right to convey the land to Johnie for $3150, which was the amount the Federal Land Bank was willing to lend on the land, if he wished to do so; and Mose had a right to convey the land to Johnie for that amount, even though Johnie may have indicated a willingness to buy the land at the price of $90 per acre. No witnesses testified that Mose ever claimed that Johnie had agreed to pay him $90 per acre for the land, or that Johnie had agreed to execute a note or a deed of trust evidencing any agreement to pay any additional sum of money for the land.

We think the reasonable inference to be drawn from the testimony as a whole is that Mose realized that he could not live much longer; he had decided to move to Memphis, where he had bought a home; Johnie had been good to him and had looked after him; and Mose wanted Johnie to have the land. Johnie found out from Mr. Wiygul that he could borrow from the Federal Land Bank only $3150 on the land, and Mose decided to let Johnie have the land for that amount rather than take a second mortgage on the land which would probably result in Johnie losing the land after Mose's death. Mose's conveyance of the land to Johnie, under those circumstances, did not constitute an unjust enrichment of Johnie, or create a resulting trust in favor of Mose's estate for any additional sum of money which Mose's heirs or legatees might think that Johnie should have been required to pay for the land. Mose did not create an express trust for his own benefit when he conveyed

the land to Johnie; and this Court cannot, under the facts disclosed by the record, create an implied or resulting trust for the benefit of Mose's estate, upon the assumption that it was Mose's intention that Johnie should hold the legal title subject to the payment of an additional $8550 to Mose's estate. We think that Mose's intention was not left in doubt. Mose expressed his intention to Mr. Bowdre and Mr. Wiygul at the time he executed the deed, and that was that Johnie should have the land in fee simple for $3150. The appellants would have us impute to Mose an intention which Mose expressly disclaimed at the time he executed the deed. This we cannot do under the facts disclosed by the record.

 █ This Court has held in numerous cases that proof of facts relied on to establish a constructive or resulting trust in a case of this kind must be clear and convincing. Moore v. Crump, 84 Miss. 612, 37 So. 109; Coleman et al. v. Kierbow, 212 Miss. 541, 54 So. 2d 915; Stovall v. Stovall, 218 Miss. 364, 67 So. 2d 391; Summer et al. v. Summer et al., 224 Miss. 273, 80 So. 2d 35; Lipe v. Souther, 224 Miss. 473, 80 So. 2d 471. And the general rule is that oral evidence offered to prove such facts must be received with caution. Indeed, "So reluctant are the courts to ingraft a trust by parol on the legal title to real estate, or to enforce an alleged parol trust in personal property, that there is perhaps no better-established doctrine than the one which requires a high degree of proof in order to establish the trust by parol evidence." 54 Am. Jur., 478, Trusts, par. 620.

 █ We think the evidence offered on behalf of the appellants in this case was wholly insufficient to establish either a constructive or a resulting trust.

 █ Finally, it is argued that the court erred in permitting Johnie Saulsberry to testify concerning matters which occurred prior to Mose's death. We think that there was error in the court's ruling on that point. The claim here is a claim which, if allowed, would con-

stitute an asset of Mose's estate to be paid over to the administrator. The claim, as alleged in the bill of complaint, was a claim on behalf of the estate which originated during Mose's lifetime. Johnie was therefore an incompetent witness under the statute (Section 1690, Code of 1942) to testify concerning any of the matters occurring prior to Mose's death which tended to establish his defense to the claim. Coleman v. Kierbow, supra, and cases cited. But the admission of Johnie's testimony, in our opinion, does not constitute reversible error. Much of Johnie's testimony concerning facts which occurred prior to Mose's death was merely corroborative of the testimony of other witnesses, and especially the testimony of Mr. Bowdre and Mr. Wiygul. The appellants would not have been entitled to a decree, under the proof, if Johnie had not been permitted to testify. The decree of the lower court is therefore affirmed.

Affirmed.

*McGehee, C. J.,* and *Hall, Lee,* and *Holmes, JJ.,* concur.