CAMPBELL, et al. *v.* CAMPBELL

No. 43040          May 11, 1964          163 So. 2d 649

*Swep S. Taylor, Jr.,* Jackson, for appellants.

*Edwin M. Cage,* Dallas, Texas ; *Armstrong & Hoffman,* Hazlehurst, for appellees.

KYLE, P. J.

This case is before us on appeal by William Campbell and others, complainants in the court below, from a decree of the Chancery Court of Pike County rendered in favor of Joe Campbell and others, defendants in the court below, in a suit filed by the complainants seeking to cancel a deed of conveyance of 100 acres of land in Pike County, executed by Louis Campbell and his wife, Louvenia Campbell, to Joe Campbell on March 25, 1937, and also seeking to cancel certain mineral conveyances executed by Joe Campbell and the grantees and remote grantees of Joe Campbell, and oil, gas and mineral leases executed by Joe Campbell and his grantee, H. W. Kenna, and a deed of conveyance of the 100 acres of land, reserving all minerals in, on and under said land, executed by Joe Campbell to J. E. Thornhill, Sr., on February 28, 1957, and deed of conveyance executed by J. E. Thornhill to Fred Rawls on March 13, 1958.

The record shows that Louis Campbell died on April 5, 1937, and that he left surviving him a wife, Louvenia Campbell, and several children and lineal descendants of other children who had predeceased him. Louvenia Campbell, the surviving widow, died sometime during the month of September 1937. Louis was 86 years of age at the time of his death. The record shows that Louis Campbell acquired title to the 100 acres of land involved in this suit by warranty deed from Alex Magee and his wife, dated March 27, 1905, and that he moved on the land soon thereafter and occupied the same as a homestead until his death in 1937. He borrowed money on the land in 1925 and executed a mortgage deed of trust to the Federal Land Bank of New Orleans to secure the payment of the indebtedness, which was to be repaid in annual installments extending over a period

of 35 years. Louis' youngest son, Simmie, continued to live in the house with his father and his stepmother after all other members of the family had moved away. But Simmie died in January 1937; and after Simmie's death his brother Joe Campbell, who was the only one of Louis' children still living in Pike County, moved into the home to be with his father, who was still able to move around and attend to his business, but unable to work.

The deed conveying the 100 acres of land to Joe Campbell, which the complainants seek to have cancelled in the case that we have before us, was executed by Louis and his wife, Louvenia, on March 25, 1937. The deed, according to the testimony, was prepared by Gent Hutchinson, an attorney residing in the Town of Summit. The deed was properly executed and acknowledged by the grantors before A. R. Bacot, a justice of the peace of Pike County, on March 25, 1937, and was filed for record and properly recorded on March 29, 1937. The deed recited a consideration of $1.00, the receipt of which was acknowledged, and after the conveying clause the deed contained an express stipulation that Louis Campbell and his wife, Louvenia Campbell, were to have a home on the 100 acres of land as long as they lived, and that the grantee "Joe Campbell agrees to make the payments on the above lands to The Federal Land Bank as they become due and payable." Joe, as stated above, was living on the land at the time of his father's death on April 5, 1937, and continued to live on the land and to exercise exclusive control over the land, claiming it as his own, without any interference on the part of the other heirs of Louis, until the discovery of oil about 1959 or 1960.

The record shows that, on November 16, 1944, Joe Campbell and his wife, Ina Campbell, executed a mineral deed conveying a one-half mineral interest in the 100-acre tract of land to H. W. Kenna, who thereafter exe-

cuted mineral conveyances to various parties. The mineral interests owned by H. W. Kenna and his assigns, however, as hereinafter stated, have been recognized by the appellants as valid since the rendition of the above mentioned decree of the chancery court, and are not involved in this appeal. The record also shows that, on April 19, 1951, H. W. Kenna executed an oil, gas and mineral lease covering the 100-acre tract of land to R. W. Brownlee to Sun Oil Company on May 16, 1951; and that on April 19, 1951, Joe Campbell and his wife, Ina Campbell, executed an oil, gas and mineral lease covering said land to R. W. Brownlee, which lease was assigned by R. W. Brownlee to Sun Oil Company on May 16, 1951. As a result of the above mentioned assignments of the Kenna lease and the Campbell lease to the Sun Oil Company, the Sun Oil Company acquired full drilling rights and a full seven-eights working mineral interest in the 100-acre tract of land. The record also shows that, on February 28, 1958, Joe Campbell and his wife, Ina Campbell, conveyed the 100-acre tract of land (including a four-tenths mineral interest) to J. E. Thornton, Sr., reserving unto themselves a one-tenth mineral interest. This one-tenth mineral interest reserved by Joe Campbell is the only interest in the 100-acre tract of land involved in this appeal. On March 13, 1958, J. E. Thornhill, Sr., conveyed the above mentioned land to Fred Rawls, reserving unto himself all minerals in, on and under the land. J. E. Thornhill, Sr., executed various mineral conveyances which the appellant sought to have cancelled in their bill of complaint. Those mineral conveyances, however, are not involved in this appeal.

The bill of complaint in this cause was filed on August 16, 1962. The complainants alleged in their bill that the complainants and Joe Campbell were the heirs at law of Louis Campbell, deceased, and the owners of the 100 acres of land described in the bill of complaint

and in the deed of conveyance executed by Louis Campbell to Joe Campbell on March 25, 1937; and that the defendants were parties who asserted rights and interests in the land under purported instruments of conveyance appearing of record in the office of the Chancery Court Clerk of Pike County.

The complainants further alleged that the deed of conveyance executed by Louis Campbell, deceased, on March 25, 1937, was void because it was a forgery, and that all other instruments deriving their source from said deed were null and void. The complainants further alleged in their bill that Louis Campbell was, and had been for sometime prior to the execution of the deed, mentally incompetent to a degree which rendered him unable to know, understand, comprehend, or transact the simplest matters. The complainants further allege that on November 16, 1944, Joe Campbell and his wife had attempted to convey one-half of the minerals in said land to J. W. Kenna by a mineral deed executed and filed for record; that on February 28, 1958, Joe Campbell and his wife had attempted to convey the 100 acres of land, including an undivided four-tenths interest in the minerals, to J. E. Thornhill, reserving unto himself a one-tenth undivided interest in the minerals; and that on March 13, 1958, J. E. Thornhill had attempted to convey the 100 acres of land to Fred Rawls, reserving all mineral rights of every kind in the land. The complainants further alleged that certain other mineral deeds and other instruments had been executed by Joe Campbell and those claiming under him; and that Sun Oil Company had been engaged in drilling operations on said land and the removal of oil and minerals from said land and to the detriment of the complainants, and for which the complainants had never been paid.

The complainants further alleged that, at all times prior to the execution of the above mentioned mineral deed by Joe Campbell and his wife to H. W. Kenna

and the above mentioned deed of conveyance of the land to J. E. Thornhill, the complainants were co-tenants with Joe Campbell; that they had never received any notice that Joe Campbell was claiming to hold the land adversely to them; and that the complainants had no notice that other parties were asserting any right, title and interest in the land until sometime during the year 1961.

The complainants therefore prayed that proper process be issued for the defendants named in the bill of complaint, and that upon a final hearing thereof the court would enter a decree cancelling the claims of all the defendants under and by virtue of the above mentioned instruments as clouds upon the title of the complainants to the above mentioned 100-acre tract of land. The complainants then listed 41 instruments which they asked be cancelled.

On November 12, 1962, all of the defendants except Joe Campbell filed their answer to the bill of complaint, including affirmative pleas and a demurrer, and also a motion to require the complainants to elect whether they would proceed upon the allegation of forgery or upon the allegation that Louis Campbell was incompetent at the time he executed the above mentioned deed of conveyance of the land to Joe Campbell. On March 9, 1963, the complainants filed an amendment to their bill in which they elected to proceed on their allegation that Louis Campbell was mentally incompetent when he executed the above mentioned deed, and in which they charged that Joe Campbell exercised undue influence on Louis Campbell to procure the execution of the deed. On March 14, 1963, Joe Campbell filed his answer in which he incorporated a demurrer and affirmative pleas in defense of the complainants' suit. In their answers all of the defendants denied the allegation of mental incompetency and undue influence; and as affirmative matters of defense all of the de-

fendants incorporated in their answers pleas of the statute of limitations, adverse possession, laches and bona fide purchases for value.

The cause was heard on its merits by the chancellor in vacation on March 25, 1963; and at the conclusion of the evidence the chancellor found: (1) That Louis Campbell was mentally competent to transact business on March 25, 1937, the date on which the deed to the lands in question was executed by him and his wife, Louvinia Campbell, to Joe Campbell; (2) that the evidence offered on behalf of the complainants wholly failed to prove the complainants' allegation of undue influence on the part of Joe Campbell in the procurement of the deed; and (3) that there was no undue influence exercised by Joe Campbell in connection with the execution and delivery of the deed in question. The chancellor also found that the complainants' cause of action, if any, was barred as against all of the defendants by Sections 709 and 710, Miss. Code of 1942, Rec., in that the complainants' cause of action, if any, accrued upon the execution and delivery of the above mentioned deed dated March 25, 1937, or at least upon its recordation on March 29, 1937. The defendants' pleas in bar were therefore sustained. The chancellor found that the complainants had no right, title or interest in and to the 100-acre tract of land; and a final decree was entered dismissing with prejudice the complainants' original and amended bill of complaint.

From that decree the complainants have prosecuted this appeal.

The appellants' attorney has stated in his brief that the sole and only question before the court on this appeal is whether the appellants, together with the appellee, Joe Campbell, are tenants in common and joint owners of an undivided one-tenth mineral interest in the lands in question; that the appeal does not apply to the ownership of the other undivided nine-tenths mineral

interest or the surface rights in the 100-acre tract of land.

It is the appellants' contention on this appeal that the chancellor erred in his finding that Louis Campbell was mentally competent to transact business at the time of the execution of the deed of conveyance by him and his wife to Joe Campbell on March 25, 1937; that the chancellor erred in his finding that the complainants failed to prove their charge that the deed was executed as a result of the undue influence exercised by Joe Campbell; and that the chancellor erred in refusing to hold that the complainants were tenants in common and joint owners, with the appellee Joe Campbell, of the undivided mineral interest in the 100-acre tract of land claimed by Joe Campbell at the time of the trial. It is also contended that the chancellor erred in his holding that the complainants were barred of their right to recover by virtue of the ten-year statute of limitations.

We have made a careful examination of the record, and in our opinion there is ample evidence in the record to support the findings of the chancellor that Louis Campbell was mentally competent to execute the deed of conveyance of the 100 acres of land to Joe Campbell on March 25, 1937, and that the complainants' proof failed to show that a fiduciary relation existed between Louis Campbell and Joe Campbell at the time the deed was executed. We also think that it cannot be said that the chancellor erred in his finding that there was no evidence to support the charge of the complainants that the deed was executed by Louis Campbell as a result of the exercise of undue influence by Joe Campbell.

Joe Campbell, who was called to testify as an adverse witness by the complainants, testified that he was living in the house with his father and his stepmother, taking care of them, at the time his father died. His younger brother, Simmie, had died in January 1937, and Louis

asked him to come and stay with him and take care of him. Louis was up and able to go wherever he wanted to go at the time Joe moved in with him. His illness came later. Joe stated that Louis made a "will" which was filed for record in the courthouse in Magnolia; that Louis left the property to him and he was to pay all of the indebtedness on the property and any other debts that Louis might owe. Joe stated that he and his wife and his two brothers in law were present when the instrument was executed; that Lawyer Hutchinson came out there and Mr. Albert Bacot came with him. Joe stated that his father made the will about three weeks before he died. He did not remember the date. He was asked whether his father also signed a deed. His answer was, he just signed one instrument. He stated that after his father signed the instrument the justice of the peace Bacot and Lawyer Hutchinson had it recorded — that was before his father died. Joe stated that Herman Allen brought Judge Bacot out there and Louis told Judge Bacot how he wanter it fixed, and they turned it over to Lawyer Hutchinson, who fixed the will after he carried it back to his office.

Joe stated that after his father's death he paid the Federal Land Bank around $800, which included back interest and back taxes; that he worked for the money to pay the indebtedness; that he borrowed some of the money from different people and worked to pay it back. He stated that his sister was dead at the time of his father's death, and his two older brothers, John and Dan, were gone; that John was living in Freeport, Illinois, and Dan was living in Gulfport, Mississippi. He wrote both of them and sent them telegrams to come to the funeral. He told his brothers that Louis had made a will. He asked them to help pay the debts, but they said it was up to him to take care of the debts. Joe stated that Lawyer Hutchinson was his father's lawyer; that he had been to Lawyer Hutchinson's office once

before the paper was prepared to see him about getting back one of Louis' cows that a man had taken away; and while he was in the lawyer's office, the lawyer told him to tell his father that, since he was staying there with him, his father should make a will and leave the property to him to take care of him until his death and pay all of his debts; that the lawyer told him to tell his father what he said. That was a good while before Louis died. Joe stated that he did not talk to his father about giving him the property; he just told his father what the lawyer said.

On direct examination by his own attorney Joe stated that his brother Monroe died in 1936 about a year before his father's death; that his younger brother, Simmie, died in January 1937, and that was when he moved in to stay with his father. He was the only one of the children living anywhere around there. Joe stated that he did not have anything to do with the writing of the will or deed. He stated that the instrument was read to his father and stepmother by Judge Bacot before it was signed; and Louis said it was all right, and that was what he wanted. The deed dated March 25, 1937, was read to Joe, and Joe stated that it was the instrument that he was talking about and that it was signed out there before Judge Bacot. Joe stated that Louvenia died in September 1937, and that none of the heirs of his father ever disputed his title at any time from the death of Louvenia until the time that John Campbell, who lived in Freeport, Illinois, came to see him in 1960 about trying to take the land away from him. That was after the oil company started boring for oil on the land.

Three other witnesses were called to testify by the complainants concerning the execution of the deed and the mental condition of Louis Campbell at the time the deed was executed.

Harry Scott testified that he was in Louis Campbell's home off and on during his illness. Louis was real

feeble. He did not have his right mind at all times. His mind was bad sometimes and sometimes good. He was present at Louis' house on March 25, 1937, when Louis signed the instrument, whatever it was. Curtis Allen, Herman Allen and Harry Scott, Ina and Joe Campbell were at the house at that time. The instrument was signed on the back porch. Harry stated that he did not read the instrument and did not know what kind of instrument it was. Louis talked at random at times that day and at times he didn't. Oscar Neal testified that he knew Louis Campbell during his lifetime and visited him shortly before his death; that he went to see him about two weeks after he got sick, and he went back to see him again about a week before he died. Louis was out of his head and hardly knew him. He had been "mindless" a good while. He just talked at random. On cross-examination Oscar stated that he knew Joe Campbell, and he was a friend of Joe's "in a way." He was a friend of Louis; but Louis had been "off" many times; some days his mind was good and some days it was bad.

Curtis Allen testified that he lived in New Orleans; that he was acquainted with Louis Campbell during his lifetime, and that he stayed with him one year and was living with him when he died; that Louis was ill and "kinda mindless"; that he couldn't walk, and he would go places and could not come back by himself; that he was sick in bed before he died. Curtis stated that "Judge Porter" from Summit wrote a "will" for Louis; that when he first came Louis wanted him to make a will for him, and "Judge Porter" wrote it out and told them to bring Louis out on the porch and let him sign it. Louis was trembling so he would not write his name, and he made an "X" and Curtis and his brother signed their names to it. Louis acted that day "like his mind would go and come." On cross-examination Curtis admitted that he had been sick himself and had had two

strokes in July and September 1956. He stated that he never did see a deed, and he did not know anything about the deed that was executed before Judge A. R. Bacot.

Mrs. Julia Dunaway, who was called to testify as a witness for the defendants, stated that she lived in the community where Joe Campbell's land was situated and had lived there all of her life. She knew Louis Campbell during his lifetime, and saw him very often. She visited him three or four times during his last illness. Mrs. Dunaway was asked whether she could express an opinion as to the competency of Louis Campbell to transact business on or about March 25, 1937, which was two or three weeks before he died. She stated that she could express an opinion, and in her opinion Louis was competent to know what he was doing in transacting business. She stated that his mind was alert, and in her opinion he was a man that could not be easily influenced. Gussie Spencer, who was called to testify as a witness for the defendants, testified that she lived in the Shady Grove Community only a short distance from the Joe Campbell land. She knew Louis Campbell during his lifetime. She saw him every fourth Sunday when he came to his church. She visited him often when he got sick, and she visited him during his last illness, sometimes twice a week and sometimes more than that. Louis had a good mind, strong and intelligent. Gussie stated that during the last three weeks before Louis died his mind was clear, "he could talk as he always had," and in her opinion Louis was competent to transact business.

F. L. Kenna testified that he lived at Summit and that he had been a rural mail carrier for a period of forty years. His mail route served the community in which the Joe Campbell land was situated. Kenna stated that he knew Louis Campbell during the last twenty years of his life, and he saw Louis frequently; that

Louis liked to talk, and he enjoyed talking with him; that he considered Louis a very intelligent man, a "very determined" man. On cross-examination Kenna stated that he did not know of his own personal knowledge how long Louis was sick before he died — "they say about three weeks," and he did not see Louis during that time. Kenna stated that after Louis' death, Joe Campbell was in charge of the farm, and it was his impression that Joe was the owner. He never saw any of the other children of Louis Campbell visit the place.

■■ ■ It can be readily seen that there was a conflict in the testimony of the complainants' witnesses and the testimony of the defendants' witnesses on the issue as to Louis Campbell's mental competency to transact business at the time of the execution of the deed to Joe Campbell on March 25, 1937. That conflict in the evidence presented a question of fact which was resolved by the chancellor in favor of the defendants. As to the question of undue influence, the chancellor was of the opinion that the proof did not go far enough to prove that a confidential relation existed between Joe Campbell and his father at the time the deed was executed; and the chancellor found that the evidence offered on behalf of the complainants wholly failed to prove the allegation of undue influence on the part of Joe Campbell in connection with the execution and delivery of the deed.

■■ ■ It has been repeatedly held by this Court that the findings of the chancellor on disputed issues of fact will not be disturbed by this Court on appeal, unless it appears that the chancellor's findings are manifestly wrong. Stovall v. Stovall, 218 Miss. 364, 67 So. 2d 391; Little v. Little, 218 Miss. 467, 67 So. 2d 462; McCormick v. McKinnon, 219 Miss. 184, 68 So. 2d 301; Smith v. Batesville Security Bank, 222 Miss. 38, 75 So. 2d 77; Bullock v. Green, 224 Miss. 278, 80 So. 2d 37; City of Picayune v. Quick & Grice, Inc., 238 Miss. 429, 117 So.

2d 718; Little v. Dalrymple, 242 Miss. 365, 135 So. 2d 403.

We think it cannot be said that the chancellor's findings on the issues of mental competency and undue influence were manifestly wrong. We also think it cannot be said that the chancellor erred in his finding that the evidence was insufficient to show that a confidential relation existed between Joe and his father at the time the deed was executed. Saulsberry v. Saulsberry, 232 Miss. 820, 100 So. 2d 593.

In Cresswell v. Cresswell, 164 Miss. 871, 140 So. 521, which was a suit by the grandmother, and after her death by the heirs, to set aside a deed made to her grandson who agreed to live with her, the Court held that the presumption of fraud or undue influence does not arise because of blood relationship accompanied by affection between the parties.

In Saulsberry v. Saulsberry, supra, the Court said: "The relationship of parent and child, grandparent and grandchild, or brother and sister, is not intrinsically one of confidence; and even though a fiduciary relationship be proved, a constructive trust does not arise in a case of this kind unless there is also proof of an abuse of the confidence imposed."

The record shows that Louis Campbell, after Simmie's death, felt the need of having someone whom he could trust come and live with him and care for him and his wife, Louvenia. Louis realized that he could no longer work and make a living for himself and his wife and pay the annual installments of the indebtedness which he owed to the Federal Land Bank, and Louis requested Joe to come and live with him. Joe complied with Louis' request; and Louis had a right to convey the property to Joe for the consideration stated in the deed which he executed on March 25, 1937.

Since the chancellor found that Louis Campbell was mentally competent to execute the deed of conveyance to Joe Campbell on March 25, 1937, and that there was

no undue influence exercised by Joe Campbell in connection with the execution and delivery of the deed, no cotenancy relation in the ownership of the property ever existed between Joe and the other heirs of Louis after Louis' death. Griggs v. Griggs (1953), 218 Miss. 433, 67 So. 2d 450. Joe's possession of the land after Louis' death was that of sole owner under a valid deed of conveyance from his father, and not that of a tenant in common with the other heirs of his father.

We find no reversible error in the record, and the decree appealed from is therefore affirmed.

Affirmed.

*Gillespie, McElroy, Rodgers and Patterson, JJ.,* concur.