**MANGET BROTHERS, INC., et al.,**
**Appellants,**

v.

**The BANK OF GREENWOOD, Green-**
**wood, MISSISSIPPI, Appellee.**

No. 22769.

United States Court of Appeals
Fifth Circuit.

July 20, 1967.

Rehearing Denied Sept. 20, 1967.

Lomax B. Lamb, Jr., Marks, Miss., Jerred Blanchard, Memphis, Tenn., James C. Pittman, Jr., Odom, Odom & Pittman, Greenwood, Miss., William R. Powell, Foreman, Dyess, Prewett, Henderson & Cantey, Houston, Tex., Larkey, Dudley & Blanchard, Memphis, Tenn., for appellants.

Hardy Lott, R. Cunliffe McBee, Stanny Sanders, Lott & Sanders, Bell & McBee, Greenwood, Miss., for appellee.

Before GEWIN, COLEMAN and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

These three diversity suits concern certain courses of dealing and usages of trade within the cotton business. The consolidation of the suits has brought about a three-way battle in which each of three parties [1] interprets these dealings and usages as falling easily and squarely within his choice of common legal rubrics. Nothing, however, is that simple.

The suits were brought by Manget Brothers, Inc. (Manget) and Anderson-Clayton and Company (Anderson), two cotton companies, and by H. A. Phillips, the Trustee in Bankruptcy for Collins Hill, Jr. and Mrs. Eleanor Hill, doing business as the Hill Cotton Company (Hill). Each suit named the Bank of Greenwood, Greenwood, Mississippi (Bank), as defendant, and each arises from the dealings of the Hill partnership in the cotton business in Greenwood.

The subject matter of the suits is $300,713.42 in checks made by the Commodity Credit Corporation payable jointly to Hill and Bank. After endorsement, Bank used the entire sum to reduce Hill's indebtedness to it. The trustee argues that Bank was entitled so to apply only $100,000 of the sum and should have turned the remainder over to Hill, and that failure to do so caused the bankruptcy. Manget and Anderson claim that Bank was under a duty to pay $63,000 of this sum to them. No one would contend that the mere knowledge by Bank that Hill had outstanding debts to them immobilized or disarmed Bank in pursuit and capture of Hill's funds to reduce and liquidate Hill's indebtedness to Bank. They do claim that Hill had acquired that sum only while acting as agent for Manget and Anderson in purchasing from the C.C.C. and Bank knew it; or because a resulting or constructive trust was impressed on that

---

1. Two parties with identical interests, as will be explained below, are here counted as one.

sum by dealings to be explained below, and because Bank had sufficient knowledge of the facts for creation of such a trust.

Bank's answer contained denials and affirmative defenses. Generally it denied the knowledge ascribed to it by plaintiffs and stated that Hill had not been Manget's and Anderson's agent in the C.C.C. transactions.

After trial without a jury, the district judge, upon exhaustive findings of fact and law, found for the defendant. The plaintiffs appeal, and we affirm.

Hill began buying and selling cotton in Greenwood in 1952. Under a written agreement, Bank financed Hill by allowing Hill to draw overdrafts on its account as long as those overdrafts were adequately secured. The Bank had broad powers to call overdraft loans and to liquidate the account. Hill usually pledged as collateral warehouse receipts for cotton which Hill currently owned.

The transaction producing the questioned payment in the present case was part of a C.C.C. program which sought to foster export of American cotton. C.C.C. had large quantities of American cotton which it had purchased to support the domestic price. It offered this cotton for sale to purchasers who promised to export for foreign sale an identical amount of cotton (but not necessarily the identical cotton purchased) by the end of a certain stated period.[2] The price of cotton from the C.C.C. was generally about $30 a bale less than that of cotton purchased on the open market in the United States. The C.C.C. price of cotton was attractive, but many firms were unwilling to incur the concomitant export obligation. Induced by this situation, a practice arose in the cotton industry whereby a firm such as Hill would purchase C.C.C. cotton for immediate resale to another firm. In such a transaction, all parties, including the

C.C.C., understood that only the direct purchaser from C.C.C. incurred the export obligation. For its services in purchasing the cotton and in incurring this obligation, the direct purchaser was paid a commission by the subsequent purchaser. The direct purchaser was then left to satisfy the obligation to sell a similar amount of cotton on the foreign market by himself, with no interference or aid from the subsequent purchaser.

Upon delivery, the C.C.C. cotton was generally reweighed and regraded to check whether the C.C.C. had been overpaid or underpaid.[3] When this process showed that the C.C.C. had been overpaid (as was often the case), the C.C.C. refunded the excess to the direct purchaser, who in turn was obligated to pay it to the subsequent purchaser. Refunds usually amounted to about $7.50 a bale. The right to receive such refunds arose so frequently that the cotton trade gave the name "rights" to a subsequent purchaser's entitlement to them. A subsequent purchaser who had such "rights" became known as a "rights creditor."

Hill participated in these programs as a direct purchaser of cotton from C.C.C., reselling the C.C.C. cotton to domestic buyers and incurring the obligation to sell abroad. When refunds from C.C.C. became due, Hill deposited those sums in its overdraft account with Bank.

Under C.C.C.'s 1958–59 program, Hill at the request of the plaintiffs Manget and Anderson (and another party not a part of this lawsuit) made a purchase of 5,420 bales of C.C.C. cotton for $553,079.49, in a transaction known as Sale Number 1845. Upon confirmation of Hill's bid to C.C.C., C.C.C. drafts on Hill came to Bank with warehouse receipts for the cotton attached. Bank permitted Hill to accept these drafts and advanced funds for payment through the overdraft account, using the warehouse receipts as collateral. At this point in

---

2. The C.C.C. programs lasted a year each, running from August 1 to July 31. The foreign sale had to be made before the end of the "program year" during which the purchase from C.C.C. was made.

3. Cotton sold by C.C.C. had generally been stored for long periods. Owing to moisture absorption and staple deterioration during this time, reweighing and reclassification were often called for.

the transaction, Bank was obligated to honor the C.C.C. drafts drawn on Hill, but the funds of the subsequent purchasers, Manget and Anderson, had not yet been received.

Then Hill drew drafts on Manget and Anderson and attached warehouse receipts for the respective amounts of cotton purchased by each, forwarding these to the subsequent purchasers' banks, which honored the drafts and forwarded payment to Bank, which payment was used to reduce Hill's overdraft indebtedness.

The net effect of this payment procedure, which is crucial to an aspect of this case, was that Hill purchased the cotton from C.C.C. with funds from the overdraft account, Bank accepting the warehouse receipts as collateral before payment from Manget and Anderson arrived. Then, in a subsequent sale, Bank released to Manget and Anderson the warehouse receipts attached to sight drafts which were then honored.

As was usual, requests by Manget and Anderson prompted Hill to ask C.C.C. for reclassification and reweighing of the Sale 1845 cotton, which resulted in the determination that about $63,000 in refunds was due Hill and, subsequently, Manget and Anderson. However, during 1958, Hill had become involved in a serious controversy with C.C.C. concerning Hill's fulfillment of export obligations arising from its C.C.C. contracts. As a result, C.C.C. refused to pay to Hill any refunds due after reclassifica-

tion and reweighing. Among the refunds which C.C.C. refused to make at this time was the $63,000 refund from Sale 1845.

This withholding of refunds seriously impaired Hill's financial position and its overdraft account with Bank.[4]

On January 24, 1959, Bank's financial status was checked by Mississippi bank examiners. These examiners warned Bank on February 19 that the state of the Hill overdraft account was unsatisfactory because of insufficient collateral. Bank pressed Hill and obtained from it an assignment, dated April 1, 1959, of $100,000 of the money which C.C.C. was withholding from Hill because of their dispute. A copy of the assignment was sent to C.C.C., which replied to Bank by letter: "If we have any payment to make to Hill Cotton Company, Greenwood, Mississippi, after our claim against said company is settled, we will make payment to the Hill Cotton Company and your bank jointly and mail the draft disbursement to you [Bank]."

The trial judge found that if the C.C.C. funds had become available to Hill as of April 1, Bank would have permitted Hill to use the amount of such refunds over $100,000 as Hill desired.

Contemporaneously with this assignment, Bank and Hill drew an agreement set out in the margin.[5] Bank and Collins Hill, Jr. signed the agreement. Mrs. Eleanor Hill did not, although the instrument was prepared for her signature. The trial judge found that mention in

---

4. Hill generally deposited the refund checks in its overdraft account with Bank. At one point in 1957, before the events relevant to the present case, Bank refused to allow Hill to make further cotton purchases on overdraft. Bank, at Hill's request, then telephoned C.C.C. and obtained release to Hill of refunds then owing; Hill deposited these in its overdraft account, and Bank permitted additional borrowing. The trial judge found that "Such a course of dealing caused Bank to rely on C.C.C. refunds to Hill in fixing the amount of credit to extend Hill through this overdraft account."

5. "It is understood by the undersigned on behalf of Hill Cotton Company and The Bank of Greenwood, that the assignment of CCC funds to The Bank of Greenwood for the account of Hill Cotton Company is to cover any possible indebtedness of Hill Cotton Company, and/or Collins Hill, Jr., and Eleanor M. Hill, to The Bank of Greenwood at the time such funds are disbursed. It is expressly understood that there may be certain funds over and above the $100,000.00 assignment paid by the CCC to Hill Cotton Company which in fact do not belong to Hill Cotton Company. In the instance of such payments, the funds so received will be disbursed promptly to Hill Cotton Company so that proper disbursement may be made by Hill Cotton Company."

the agreement of funds not belonging to Hill referred to funds owed Kempner, a company which is not a part of the present litigation, but which was a part of the controversy between C.C.C. and Hill. Although Mrs. Eleanor Hill testified that reference was there made to the rights creditors of Sale 1845 (Manget and Anderson, plaintiffs here), the trial court did not credit this testimony. Collins Hill, Jr., although present at trial, did not testify.

After April 1, Hill's account with Bank steadily deteriorated.[6] Prices brought by sale of Hill cotton pledged to Bank were not high enough to justify the worth placed on the cotton by Hill's representations to Bank.[7] Bank advanced, without additional collateral, substantial sums to Hill for operating purposes, permitting Hill to sell pledged cotton on Hill's own market judgment.

In addition, Hill at this time planned to start operations in Harlingen, Texas, where the harvest is earlier than in Greenwood. Hill wished to borrow $50,000 from Bank to finance these operations when the C.C.C. refunds arrived and discussed the matter with Bank. The trial court found:

"During these discussions, Hill believed that Bank had firmly agreed, when the CCC payment was received, to allow Hill to pay about $63,000 to 'rights creditors' and to lend Hill $50,000 for the Texas operations. This is not shown by a preponderance of the evidence. Thus the court must find that no such firm commitment was made."

The long negotiations between Hill and C.C.C., in which Bank participated on Hill's behalf, bore fruit in July. It was agreed that Hill would be penalized $50,000, and that all other claims arising from reclassification and reweighing, amounting to more than $320,000, would be paid to Hill.

On August 3, C.C.C. drafts totalling $300,713.42 reached Bank and were endorsed by the Hill office manager and by Bank and deposited in the overdraft account. The Hill office manager then presented $63,000 in checks drawn on the overdraft account for purchase of New York exchange for payment of the "rights creditors" of Sale 1845. Bank declined to honor these checks until the C.C.C. drafts cleared.[8] The payment of the C.C.C. funds brought Hill's equity in the overdraft account to approximately $70,000 to $80,000.

The Hill operations had by this time started in Texas, and the Hills expected the $50,000 to arrive there on August 4, after the payment of the C.C.C. funds. When it did not arrive, Collins Hill, Jr. called Bank and demanded that Bank allow payment of $63,000 to the "rights creditors" and lend Hill the $50,000 for use in its Texas operations. Bank stated that it would do either but not both, owing to the depressed state of the Hill account. Collins Hill replied that if he could not have both, he would do neither. The conversation ended inamicably. The checks for payment of the $63,000 were never again presented for payment by Hill.

On August 6, Bank notified Hill that it was calling the overdraft account and requiring liquidation of it. Liquidation was completed by January 15, 1960, with no loss to Bank. The "rights creditors" of Sale 1845 were not paid, but the trial court found: "No firm action was taken

---

6. On April 1, Hill owed Bank $724,619.25. Loan value of collateral other than cotton was $63,137.44. Warehouse receipts for 4,033 bales of cotton were pledged to Bank. Thus the average per bale indebtedness was then $164.51. On May 1, this per bale indebtedness was $178.74. it had risen to $188.59 per bale by June 1; to $197.95 on July 1 and to $257.07 on August 1.

7. Grade and staple of cotton are not indicated on warehouse receipts. Bank had relied on Hill's representations of value.

8. The Hill office manager testified that he would not have endorsed the C.C.C. remittances and deposited them in the overdraft account if he had thought that the "rights creditors" would not then have been paid. "Thinking" does not make a contract or create a trust.

by Manget and Anderson during this liquidation to assert their claims as 'rights' creditors."

On January 23, 1961, the Hills individually and as partners filed bankruptcy petitions in Harlingen, Texas.

■ Even though a trial judge's findings of fact are not as sacrosanct as those of a jury,[9] we hold that the district court's findings here were not clearly erroneous. F.R.Civ.P. 52(a). Daniel v. United States, 5 Cir. 1956, 234 F.2d 102.

I. As we agree with the trial judge that none of the plaintiffs has a cause of action against the common enemy, the Bank, we need not declare a victor in the subsidiary battle between the plaintiffs as to whether the trustee or the "rights creditors" should receive the recovery. Judgment must go to the Bank. The parties here were commercial venturers, whose entrepreneurial conduct in this sophisticated export-import enterprise bears none of the indicia of a trust either constructive or resulting, or of agency, or of any fiduciary relationship. Here credit was extended and promises exacted. Here too are reliances and expectations. These are not the only components of a trust, an agency, or fiducial protection. All of these we find every day in the market places. There is no mystique in the relationship of the parties. The legal relationships of agency and trust do not approach as phantoms on gossamer wings; they come as firmer stuff.

■ A. Manget, Anderson, and the trustee importune us to hold that Hill was the agent of Manget and Anderson in making the cotton purchase, and therefore, they argue, the refunds in the agent's hands belonged to Manget and Anderson as principals. But essentials of the agency relationship are missing. The relationship between Hill and Manget and Anderson was that of seller and buyers, of debtor and creditors. The problem of whether to characterize a

9. Continental Casualty Co. v. Stokes, 5 Cir. 1957, 249 F.2d 152. In that case an insured sought a declaration of rights under a health and accident policy. The plaintiff based his case largely upon depositions, documents, and transcript of an earlier trial. We held:

We recognize, of course, that the requirements to be followed in the appellate review of findings of fact returned by a jury, * * * do not apply in the review under Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A. of findings rendered by a judge sitting without a jury and that evidence sufficient to support a jury verdict may not sustain a trial judge's finding (See Orvis v. Higgins, 2 Cir., 180 F.2d 537, certiorari denied 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595). It is also true, as we have observed (Galena Oaks Corporation v. Scofield, 5 Cir., 218 F.2d 217), that the duty at this level to adhere to the trial court's findings as presumptively correct becomes less compelling as the ability of the appellate court to evaluate credibility and weigh evidence approaches that of the judge below, owing, for example, to the documentary or undisputed character of the proof. These considerations, however, neither require nor suggest reversal here.

The facts upon which the trial judge's finding rests are not undisputed. The plaintiff, in addition, testified in open court. Although the remaining proof is entirely documentary, it does not render the plaintiff's testimony immaterial to the decision of this case nor the trial judge's evaluation of his credibility unimportant. Here, in fact, the opportunity to observe the plaintiff as a witness is peculiarly important, for his credibility not only influences the weight to be given to his own testimony in open court, but also affects to an appreciable degree the trustworthiness and persuasiveness of much of the documentary proof as well. * * * The data upon which much of the expert testimony was based being singularly within the plaintiff's control, his credibility is inevitably involved in assessing the appropriate weight to be given to that medical evidence. We cannot duplicate the opportunity of the trial judge to appraise that proof even though it reached him in documentary form, and we note that he acknowledged reliance upon the appearance and demeanor of the plaintiff upon the stand in evaluating the medical testimony. 249 F.2d at 154.

party as an agent is dealt with in § 14K of Restatement (Second), Agency (1958):

"Agent or Supplier. One who contracts to acquire property from a third person and convey it to another is the agent of the other only if it is agreed that he is to act primarily for the benefit of the other and not for himself."

Comment a to this section suggests "Factors indicating the one who is to acquire the property [Hill] and transfer it to the other [Manget, Anderson] is selling to, and not acting as agent for the other are:

(1) That he is to receive a fixed price for the property, irrespective of the price paid by him. This is the most important. (2) That he acts in his own name and receives the title to the property which he thereafter is to transfer. (3) That he has an independent business in buying and selling similar property. None of these factors is conclusive. The question arises in a variety of ways."

Each of these factors describes the transactions in question here. Hill had an independent business buying and selling cotton. Hill acted in its own name and got title to the cotton (owing to the facts showing that Hill actually bought the cotton with overdraft account funds and then resold it to plaintiffs, and that the liability for export was Hill's). Hill's cotton purchase in Sale 1845 was a part of its own separate enterprise.[10] Finally, in a real sense Hill received a fixed price from Manget and Anderson,[11] irrespective of the price Hill paid, because the "price" paid by Hill must be said to include the assumption of the export obligation. In other words, in order to get the cotton from C.C.C., Hill had not only to pay the money which Hill charged its subsequent purchasers, but also had to "pay" C.C.C. by promising to export a similar amount of cotton within a certain time. This obligation was speculative on Hill's part, as the vicissitudes and difficulties of the foreign market might make the export obligation simple or difficult to fulfill, profitable or unprofitable. Manget and Anderson paid Hill a fixed commission instead of incurring this speculative export obligation. Manget and Anderson did not stand to share in any gain, or suffer from any loss, from Hill's foreign obligations. They had no control over how or whether Hill satisfied the export obligation. The brief for the cotton companies claims that Hill "was under the continuous subjection to the will of Manget and Anderson," but by not participating in the export obligation, Manget and Anderson abrogated control over an essential part of the transaction. They were unwilling to assume responsibility to C.C.C. The Record establishes flight from such responsibility rather than adhesion. These transactions were used because Manget and Anderson did not want to deal with, and be responsible to, C.C.C. Manget and Anderson were staffed by seasoned and experienced businessmen, not by economic innocents abroad in a jungle of business wolves.

We think that the rule contended for by plaintiffs would make every wholesaler or middleman an agent. This is not the principal-agent relationship

---

10. Compare the following language from 2 C.J.S. Agency § 1c at 1024 (1936), quoted by the Mississippi Supreme Court: "An agent is one who acts for or in the place of another by authority from him; one who undertakes to transact some business or manage some affairs for another by authority and on account of the latter, and to render an account of it. He is a substitute, a deputy, appointed by the principal, with power to do the things which the principal may or can do. The most characteristic feature of an agent's employment, is that he is employed primarily to bring about business relations between his principal and third persons, and this power is perhaps the most distinctive mark of the agent as contrasted with others, not agents, who act in representative capacities." First Jackson Securities Corp. v. B. F. Goodrich Co., 1965, 253 Miss. 519, 176 So.2d 272, 278.

11. The price per bale was fixed. It was the amount and quality of cotton delivered by C.C.C. which were subject to reassessment.

which the courts and our law understand and foster.

■ **B.** Similar considerations make it obvious that no resulting trust arose in plaintiffs' favor at any stage of these transactions.

"Where a transfer of property is made to one person and the purchase price is paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid, * * *." Restatement, Second, Trusts, § 440 (1959). This rule does not cover the present case. The purchase price of the cotton (actually, of the warehouse receipts representing the cotton) transferred by C.C.C. to Hill was paid by Hill's funds from the overdraft account, not by the funds of Anderson and Manget. The Anderson and Manget funds were paid to Hill after Hill had paid C.C.C. In such cases no resulting trust arises. In Windham v. Windham, 1953, 218 Miss. 547, 555, 67 So.2d 467, 470, the Mississippi Supreme Court states:

"A resulting trust arises, if at all, in the same transaction in which the legal title passes, at the time that legal title passes, on consideration advanced before or at that time, and not from matters thereafter occurring or on consideration thereafter advanced unless occurring or advanced immediately thereafter so as to be in fact a part of the same transaction. The fundamental reason for the rule is that the resulting trust is one implied by law from the circumstances of consideration at the time of the transaction", although the trust is not affected by the failure of the person purchasing the land to obtain a valid deed or title thereto at the date of the transaction, but the trust attaches when the title is obtained subsequently. 54 Am.Jur., p. 159, Sec. 204; Moore v. Moore, 74 Miss. 59, 19 So. 953; Bush v. Bush, 134 Miss. 523, 99 So. 151. In the Moore case Judge Whitfield, speaking for the Court, quoted from the old case of Rogers v. Murray, 3 Paige, N.Y., [390,] 397, where it is said: 'After the legal title has once passed to the grantee by the deed, it is im-

possible to raise a resulting trust, so as to divest the legal estate, by the subsequent application of the funds of a third person to the improvement of the property, or to satisfy the unpaid purchase money.' [74 Miss. 59, 19 So. 954.]"

Brabham v. Brabham, 1955, 226 Miss. 165, 84 So.2d 147; See Dogan v. Cooley, 1939, 184 Miss. 106, 185 So. 783. This rule is encapsulated in Restatement (Second) Trusts § 457:

"Payment Subsequent to Purchase. Where a transfer of property is made to one person, no resulting trust arises merely because another person subsequently pays or assumes an obligation to pay for the property."

The reason for such a rule in the present case is that it emphasizes that what we have here is a sale from C.C.C. to Hill involving certain intentions and obligations, and a subsequent sale from Hill to Manget and Anderson involving a different intention and different obligations. The cotton firms incurred no obligation to C.C.C. as a result of the original transaction; their obligation to pay did not come into being until after the C.C.C. sale to Hill was completed.

■ ■ In Bird v. Stein, 5 Cir. 1958, 258 F.2d 168, 177 cert. denied 359 U.S. 926, 79 S.Ct. 608, 3 L.Ed.2d 628, we said:

"In final analysis, the existence of a resulting trust depends upon the intention of the parties as inferred from all of the circumstances. This is a factual question the trial judge resolved against the appellants. Going beyond the appellants' failure to meet the burden of proof, the trial judge held affirmatively that the facts showed there was not a resulting trust. We agree. We certainly cannot say it was clearly erroneous for the Court not to find that appellants established a resulting trust."

In the present case the perspicacity and explicitness of the trial judge's findings and conclusions justify our reliance on them. The trial judge discerned that the parties intended a buyer-seller and

debtor-creditor transaction.[12] Broken promises and unfulfilled expectations do not alone give rise to trusts. Not every relying individual becomes a beneficiary, nor every obligation defaulter a trustee. Only when it appeared that the debt would not survive bankruptcy did the plaintiffs begin to claim that they had all along been dealing with a trust.[13]

II. A. The Trustee claims first that upon the receipt of the C.C.C. refunds in drafts drawn jointly to Hill and Bank, Bank was entitled to apply only $100,000 of the total sum to diminish Hill's overdraft account indebtedness. The remainder, according to the Trustee, belonged to Hill under the Agreement signed by Collins Hill, Jr., and Bank on April 1, 1959. That agreement is set out in Footnote 5, supra.

A reading of the Agreement disposes of the Trustee's argument completely and with no strain. The Agreement states that "there may be certain funds * * * which in fact do not belong to Hill Cotton Company," and concludes that when the refunds would arrive, "the funds so received will be disbursed promptly to Hill Cotton Company so that proper disbursement may be made by Hill Cotton Company." The Agreement does not say that Hill would have unfettered use of all sums above $100,000. All it says is that "certain funds" which "in fact did not belong to" Hill would be made available to Hill to pay those to whom the funds did "belong."

The only testimony in the record indicating what this rather unclear language means is summarized in the trial judge's finding of fact number 12:

"Bank's president testified that he thought the reference in the agreement to funds not belonging to Hill had reference to funds of Kempner (who was involved with Hill in the controversy with CCC). Mrs. Eleanor Hill testified that this referred to the 'rights creditors'—Manget, Anderson and another. Collins Hill, Jr., although present for the trial, did not testify."

Mrs. Eleanor Hill's testimony as to what the agreement means is unequivocal:

"Q. Mrs. Hill, there's some language in that agreement about moneys not belonging to Hill Cotton Company. Please read it, just to yourself.

To what moneys does that agreement refer?

A. The only moneys to which it could refer would be to the rights people, the debts to the rights people, the rights people money held by the CCC."

The record discloses no attempt by Hill to obtain any of the C.C.C. refunds from Bank for the purpose of paying Kempner; and Bank did make available to Hill sufficient funds to pay both Manget and Anderson as soon as the C.C.C. drafts cleared. Hill refused to pay Manget and Anderson when it appeared that Bank refused to lend Hill $50,000 in addition. Nothing in the record indicates that the extra $50,000 was sought by Hill because it was owed as C.C.C. refunds or because it "belonged" to some third party. The

---

12. His conclusions of law state in part:
   a) The relationship between Hill on the one hand and Anderson, Manget and the other rights creditors on the other with respect to their contracts with Hill and Hill's dealings with CCC in its said transaction No. 1845 was that Hill was seller and the others were buyers.

   b) Funds coming into Hill's hands from CCC for reclassification and reweighing created only debts due by Hill to Anderson and the other "rights" creditors, which Hill by these contracts was obligated to pay. These "rights" creditors had only the right to be paid these funds by Hill.

   c) Deposits in the overdraft account of such payments from CCC to Hill did not create any fiduciary or legal obligation on the part of Bank to see these "rights" creditors paid, from the overdraft account or otherwise.
   d) No legal obligation otherwise arose on the part of Bank to pay these "rights" creditors.

13. The same conclusions dispose of any argument claiming a constructive rather than a resulting trust. See Conner v. Conner, 1960, 238 Miss. 471, 119 So.2d 240; Saulsberry v. Saulsberry, 1958, 232 Miss. 820, 100 So.2d 593, Stovall v. Stovall, 1953, 218 Miss. 364, 67 So.2d 391.

$50,000 was sought, as Mrs. Hill admitted, to finance the new Hill operations in Harlingen. We agree with the trial judge that the record fails to support any contention that Bank broke the April 1 Agreement.

B. The second contention of the Trustee appears to be that, independent of the April 1 Agreement, the Bank had agreed orally to lend Hill the $50,000 to finance the Harlingen operations.

We note that the trial judge's finding that no such commitment was made is largely based upon his assessment of the credibility of the witness, as the commitment sought to be proved was not written. We can see no reason to overturn this finding of fact.

As we have ruled that Bank is not liable to the Trustee, we need not discuss any of the contentions as to measure of damages. We also need not consider the several questions surrounding the imposition by Bank of the defense of laches. We have considered the other questions raised by appellants, and find them to be without merit.

Affirmed.