Frank WEATHERSBY, d/b/a Weathersby Cotton Co., Plaintiff-Appellee,

v.

Y. B. GORE, Defendant-Appellant.

No. 75–2501.

United States Court of Appeals, Fifth Circuit.

Aug. 3, 1977.

1. *See N.L.R.B. v. Amalgamated Clothing Workers of America*, 5 Cir., 1970, 430 F.2d 966.

J. Kimbrough Johnson, John J. Thomason, Memphis, Tenn., for plaintiff-appellee.

Before AINSWORTH and CLARK, Circuit Judges, and HUGHES *, District Judge.

CLARK, Circuit Judge:

This Mississippi-based diversity action was brought by Frank Weathersby, a Memphis, Tennessee cotton buyer doing business as Weathersby Cotton Company, against Y. B. Gore, a Webster County, Mississippi cotton farmer. Weathersby contended he had a valid contract with defendant Gore which obligated Gore to sell the cotton produced by him on 500 acres of land during the 1973 crop year. Two months after the contract was entered and many months before the cotton was to be picked, Gore gave notice that he was cancelling the contract and indicated his intention of selling his cotton elsewhere. After a jury verdict favoring Weathersby, the district court ordered specific performance of the contract. We reverse and remand.

Although the significant facts will more fully be discussed in the context of their related legal issues, a review of events preceding litigation would be helpful here. Except as indicated, the facts recited are undisputed. The genesis of this litigation is to be found in the volatility of the cotton futures market during 1972 and 1973. In 1972 Gore entered into a forward contract for the sale of his cotton,[1] but his experience was not a happy one. The price at the time the cotton was picked was lower than that provided in the contract, and the buyer refused to purchase the cotton. Gore chose to sell at the lower price rather than to bring suit.

Armis E. Hawkins, James S. Gore, Houston, Miss., James D. Waide, West Point, Miss., for defendant-appellant.

---

* Senior District Judge for the Northern District of Texas, sitting by designation.

1. Such contracts provide that a farmer will sell at a predetermined price all the cotton produced on stated acreage. In return, the farmer is assured of the price to be received regardless of fluctuations that may occur before the crop is ready to pick.

In February 1973, Louis B. Strong, president and sole stockholder of the Bluff City Cotton Co., Inc., in Memphis, inquired of John Henry George, a Webster County, Mississippi ginner and farm supply store owner, whether he was aware of any cotton farmers desiring to enter "forward" contracts for their crops. George contacted defendant Gore who he knew had entered a forward contract the year before. As a consequence of his 1972 experience, Gore insisted that any future purchaser provide a performance bond ensuring Gore against loss in the event of a similar breach. The contract in suit was negotiated at a price of 30 cents per pound. Throughout the subsequent months the price rose, until at the time performance was due the price had soared to 80 cents per pound.

According to Strong, he and George decided upon the figure of $25,000 as a suitable amount for a performance bond by concluding that $50 per acre on Gore's 500 acres of cotton was a fair estimate of Gore's potential damages in case of a breach.[2] On March 6, 1973, after a brief period of negotiations, a contract proposal was signed by Strong, who placed the notation "agent only" following his signature, and sent to Gore. Gore signed the document sent by Strong. Weathersby was named as purchaser. Pursuant to the understanding between Strong, George and Gore that each party would furnish a $25,000 performance bond in favor of the other, a clause requiring "mutual bonds" was placed in the prepared form. On the same day, a separate contract on the same type of form was executed by Weathersby and Strong which also covered the sale of Gore's 1973 cotton to Weathersby. The second contract also detailed sales by two other farmers to Weathersby which had been made through Strong. As soon as these contracts had been made, Weathersby sold this cotton for 30.70 cents per pound to Starke Taylor & Son, Inc., a cotton merchant firm in Dallas, Texas.

Throughout March, Gore continually inquired through George whether Strong knew when Weathersby would provide his reciprocal bond. George communicated these inquiries to Strong. The requirement of a $25,000 performance bond was allegedly not transmitted to Weathersby. On March 9, three days after the contracts were signed, Strong responded to a Gore inquiry by stating he would guarantee Weathersby's performance. This was unacceptable to Gore, and his rejection of this offer was sent to Strong. After Gore provided his $25,000 bond on April 6, he was told by Strong that Weathersby was in Europe but would soon procure a bond.

Between April 10 and 15, Gore phoned George to tell him he was not willing to wait much longer for the bond. Gore established a two-week deadline for receipt of the bond and notice of this specific requirement was sent to Strong and via him to Weathersby. On April 26, a $25,000 letter of credit which would expire on July 1, 1973, was mailed by Strong to George. Strong also wrote George that a bond was being prepared and that there was "no need to show this letter to Gore." On May 3, Gore through his attorney wrote Strong that the contract was cancelled.

Despite the cancellation letter, Weathersby, on May 14, sent a $25,000 performance bond to George for Gore. A subsequent bond, correcting an error in the first bond, was mailed on May 25. During this period, or somewhat later in early June, Fieldcrest Mills, Inc., a North Carolina textile company, purchased the contract from Starke Taylor for 34.8 cents per pound, giving to Weathersby a commission for arranging the sale to Fieldcrest. At the time of its purchase, Fieldcrest had knowledge of Gore's May 3 notice of cancellation.

Throughout the period following May 3 and before commencement of suit on September 28, 1973, no attempt was made by Weathersby, Starke Taylor, or Fieldcrest to effect cover. It was stipulated that any

2. The contract price of 30 cents per pound was compared to the underlying or loan value of the cotton which was 22 cents per pound. After considering the probable yield per acre, this 8 cents per pound difference was translated into a disparity of fifty dollars per acre.

party could have purchased other cotton to cover the contract expectancy on the open market.

### I. Performance Bond

■ The salient question at trial was the reasonableness of the time taken by Weathersby to procure a bond. Several different sub-questions must be faced before the larger issue of whether this question was correctly answered can be resolved. (A) A determination must be made of the date from which the time taken by Weathersby is to be measured. No clear evidence exists as to the date Weathersby himself learned of the necessity of a bond. However, if the providing of a performance bond was an enforceable provision of the March 6 contract, then Weathersby is bound by the contractual terms regardless of his actual knowledge. If George or Strong was acting as Weathersby's agent, then the agent's knowledge of and agreement to the performance bond requirement binds the principal from the date the agent acquired such knowledge. (B) As Weathersby did not succeed in presenting to Gore a document that could formally be called a performance bond until May 14, a decision must be made whether this is to be taken as the concluding date in the period used to gauge Weathersby's timeliness, or whether the providing of a letter of credit on April 26 or a letter from Strong guaranteeing payment on March 9 constitutes performance of any contract requirement of a bond. (C) It must also be determined whether the jury was properly instructed on the intertwined facts and legal questions presented and whether any failure to instruct was properly preserved.

### A. Agency

Weathersby and Gore never communicated directly about contract terms. George and Strong were intermediaries throughout the process of reaching an agreement, and eventually a disagreement. Whether either was an agent for Weathersby for purposes of making the contract sued upon here is of crucial importance in deciding the reasonableness of the time taken by Weathersby in tendering a bond.

■ At the outset we note that Gore's demand that the buyer furnish a performance bond was clearly understood by George and Strong. Gore's initial reluctance to enter into a forward contract was founded on his reluctance to expose himself to a financial loss such as that occasioned by the previous crop purchaser's refusal to honor his contract. This reluctance resulted in an agreement by Gore, George and Strong that a bond requirement would be part of the contract. Gore and Strong testified without contradiction that Gore insisted on a performance bond from the time he first agreed to consider making a forward contract on his cotton in February 1973. The critical contractual language appears as a typed addition to a printed form contract, and it reads: "Mutual Bonds will be furnished if required. Required." The ambiguity created by this strikeover and retyping of the same word capitalized necessitates an examination of the negotiations surrounding the contract.

Strong, though initially testifying that he was uncertain when the bond requirement was made, also stated that he suggested to Gore that he seek to procure a bond from the Kyle Chandler Insurance Company in West Point, Mississippi. Gore's first inquiries of Chandler occurred the day the contract was signed, thereby placing this discussion at or before that date. Strong indicated that he did not believe many farmers could succeed in acquiring a bond in the amount of $25,000, despite the fact that when the contract was signed George told Strong Gore would have no difficulty. Strong stated his belief in Gore's potential inability to acquire a bond was the only reason he, Strong, did not immediately inform Weathersby that he must procure a bond. No witness ever suggested that this requirement did not exist. Strong referred as did Gore and George to Gore's repeated and unchallenged inquiries throughout March and April concerning whether Weathersby had procured a bond. Therefore, we find there is no question of

Strong's and George's knowledge on March 6 that mutual bonds were required. The firm benchmarks are that George, Strong and Gore were fully aware of the necessity that Weathersby procure a $25,000 performance bond at least on the date the contract was signed, March 6.[3] If either George or Strong was Weathersby's agent, there would be no need to determine when Weathersby personally received notice of the bond requirement.

■ Proof of agency does not depend upon a written agreement. *Partee v. Pepple,* 197 Miss. 486, 20 So.2d 73 (1945). In the absence of express written terms creating the relationship, the existence of an agency is a fact question. *Engle Acoustic & Tile, Inc. v. Grenfell,* 223 So.2d 613 (Miss. 1969). Here the question is answered by the uncontradicted proof.

George was a cotton ginner and farm supplier who frequently assisted farmers in their crop sales. He had assisted Gore in this regard for approximately ten years preceding the contract here at issue. Strong initially contacted George for purposes of discovering whether area farmers might be interested in contracting their cotton, and thereafter George contacted Gore. Strong mailed the contract to George for Gore's signature. George was not compensated for his services. If anything, George's efforts were more an assistance to Gore than agency for Weathersby, but the resolution is unclear. Therefore, George's status forms no part of the basis for our decision in this case.

■ On the other hand, Strong's position as Weathersby's agent was well demonstrated. He initiated the discussions with George. Strong asked in February 1973 if George knew of any cotton farmers who wanted to contract their crop. After several discussions George told Strong of Gore's willingness to sell but only if Strong's buyer would provide a performance bond. After receiving word of Gore's position, Strong told Weathersby he had a farmer willing to

sell 500 acres of cotton. Weathersby, after some deliberation, told Strong he would accept the offer. Strong notified George before the contract was signed that Weathersby would be the purchaser of the cotton. Weathersby knew he might be required to provide a performance bond. Strong presigned the contract, which named Weathersby as buyer and Gore as seller, as "agent only" and mailed it to George. George then procured Gore's signature. These facts clearly indicate that Strong acted as Weathersby's agent in making this contract.

There are additional corroborations. Weathersby admitted that Strong was his agent for purposes of receiving payment for the cotton. Weathersby never undertook to communicate with Gore; rather, all of his contacts with Gore, before and after execution, were made through Strong. Strong testified he did not inform Weathersby each time some correspondence came from Gore but apparently made an independent determination of the necessity of informing Weathersby. A second contract was signed contemporaneously with the original Gore-Strong contract. It also was dated March 6 but was signed by Weathersby and by Strong as "agent only." Named as parties were several farmers (including Gore) as sellers and Weathersby as the purchaser. This contract listed the acreage of the farmers involved and provided that the cotton output from their lands would be sold to Weathersby. Gore did not sign this latter document. It contained a mutual bond proviso but not as amended in the Gore-Strong contract. The record does not show that Gore authorized or even anticipated that this latter instrument would be executed. The testimony that Strong was to receive a half-cent per pound commission, together with the provision in the Weathersby-Strong contract for payment of a half-cent more per pound than was provided for in the Gore-Strong contract, demonstrates that Strong's commission was to be paid by Weathersby.

---

**3.** Mutuality was still a condition, but the possibility that Gore would not require mutual

bonds in an amount of $25,000 was no longer open.

During his testimony Strong emphasized that he was not a cotton buyer but only a cotton seller. He admits initiating this transaction, yet contends he was only a middleman who found farmers willing to contract their crop and then purchasers desiring to enter such contracts. The contracts entered imposed no obligations on Strong and their terms did not refer to him. He did not buy and then resell. The use of two separate contracts, each stating the purchaser was Weathersby and each listing Gore as at least one of the sellers, results in some ambiguity. Since the price .term in one contract included Strong's half-cent commission and in the other did not, the contracts created inconsistent obligations. The potential legal inconsistencies of the situation do not affect our conclusion that the contract, signed by Gore and Strong, bound Weathersby to purchase the cotton from Gore's acreage and to provide a performance bond.

We conclude that Strong had the apparent if not the actual authority to contract with Gore and to bind him to the requirement of mutual performance bonds. The parameters of the apparent authority doctrine in Mississippi law were set out in *Union Compress & Warehouse Company v. Mabus*, 217 So.2d 23, 27 (1968) quoting from *Steen v. Andrews*, 223 Miss. 694, 697–98, 78 So.2d 881, 883 (1955):

"The power of an agent to bind his principal is not limited to the authority actually conferred upon the agent, but the principal is bound if the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have. The agent's authority as to those with whom he deals is what it reasonably appears to be. So far as third persons are concerned, the apparent powers of an agent are his real powers. 2 C.J.S., Agency, §§ 95, 96. This rule is based upon the doctrine of estoppel. A principal having clothed his agent with the semblance of authority, will not be permitted, after others have been led to act in reliance of the appearances thus produced, to deny, to the prejudice of such others, what he has theretofore tacitly affirmed as to the agent's powers. 2 C.J.S., Agency, § 96(c). There are three essential elements to apparent authority: (1) Acts or conduct of the principal, (2) reliance thereon by a third person, and (3) a change of position by the third person to his detriment. All must concur to create such authority. 2 C.J.S. Agency § 96(e)."

As stated in *Steen v. Andrews, supra,* "the apparent powers of an agent are his real powers." Mississippi law is also clear that the doctrine of apparent authority has no application unless an agency relationship exists, explicitly or implicitly. *XYOQUIP, Inc. v. Mims,* 413 F.Supp. 962 (N.D.Miss. 1976).

The uncontradicted evidence in this record establishes that Strong was clothed with far more than a mere semblance of authority. Weathersby agreed through Strong to buy Gore's cotton before the contracts were entered on March 6. Before the contract was made, Strong informed George and Gore that Weathersby would be the purchaser. All negotiations for the contract were by Strong. Weathersby authorized Strong to presign the contract as "agent only" and then mail it to Gore with only Gore's signature necessary before the contract became binding. After execution, Weathersby continued to deal with Gore exclusively through Strong. Gore relied to his detriment on the mutual bond requirement in the agreement entered on March 6, undertaking the effort to procure and incurring the expense of obtaining his own performance bond and then eschewing any other attempt to contract for the sale of his cotton. The evidence conclusively establishes that Strong was an agent and had the apparent if not the actual authority to accede to Gore's requirement of mutual performance bonds and to make this provision a part of the contract. *See generally, Stevenson-Whisenhunt Corp. v. Holeman,* 341 So.2d 657 (Miss.1977).

**1254**

■ Moreover, Weathersby's suit upon this contract arguably renders the agency question superfluous. Since Weathersby affirmatively states that the contract is valid, as indeed he must in order to attempt to hold Gore to its terms, he cannot deny that the person who cast its terms did not have his authorization to contract. The only issue that would remain would be whether the mutual performance bond requirement was actually a part of the contract. This is not an agency question but one of interpretation of an ambiguous section of the contract: "Mutual performance bonds will be furnished if ~~required~~. Required." We have already interpreted this provision to mean that mutual performance bonds were required.

■ The facts in this case establish that Weathersby did enlist Strong as his contracting agent for the half-cent a pound commission. Weathersby employed Strong in a capacity similar to the seller's agent in *Hohenberg Brothers Co. v. Killebrew*, 505 F.2d 643 (5th Cir. 1974). There a Mississippi cotton farmer delivered a signed cotton sales contract to his admitted agent, permitting the agent thereby to contract with any buyer seasonably accepting the terms of the presigned agreement. The court held that the agent could legally bind the principal without the need for further affirmative action by the principal. *Id.* at 645. *Cf. Manget Brothers, Inc. v. Bank of Greenwood, Mississippi*, 381 F.2d 91 (5th Cir. 1967). Since Strong had actual or apparent authority to act for Weathersby, the commencement of the reasonable period of time for Weathersby's action in furnishing the required performance bond must be measured from the date Strong knew the obligation was imposed, which was the date the contract was executed, March 6, 1973.[4]

### B. *Type of Security Required*

■ Strong offered personally to guarantee Gore that Weathersby would fulfill his contract. When Gore rejected this form of security, he acted within his contractual rights. The usual concept of a performance bond is that a financial institution will make a formal written underwriting covering the risk involved. The proof does not show that Gore had any basis for believing that Strong's personal guarantee was of any different quality than Weathersby's personal obligation. In the absence of proof that the parties intended a unique form of performance bond or that a subsequent modification of the original contract was agreed to, Strong's offer of his personal guarantee to Gore was not compliance.

■ Weathersby argues that even if the bond was required, there was no indication of the type of such security the contract demanded; therefore, the $25,000 letter of credit was sufficient to meet his part of the requirement of mutual performance bonds. The letter of credit itself belies this argument in its statement: "This letter of Credit is to be held by Y. B. Gore until performance bond is received." This demonstrates that Weathersby knew the letter of credit was merely a temporary substitute for a $25,000 performance bond. Gore argues that even if a letter of credit would not be *per se* insufficient, this particular letter of credit was inadequate. Indeed, at oral argument Gore's attorney stated a letter of credit *would have been* acceptable had it not contained an expiration date of July 1, 1973, a date months in advance of any cotton harvest. What Gore sought in contracting for a bond of $25,000 was to pre-

---

**4.** Though we make no attempt to list the various factors that properly should be considered in determining the reasonableness of the time taken by Weathersby to procure his bond, we deem it appropriate to note that one element should not be included. Strong testified that his concern that Gore might be unable to make a bond caused him to delay in notifying Weathersby of the bond requirement. This circumstance must not be a factor in the measure of reasonableness. The contract required *mutual* bonds. For Strong to await notice that Gore was able to procure a bond, unilaterally transformed the mutual bond requirement into a conditional provision, *i. e.*, Gore had the onus of proving ability to make a bond before Weathersby was required to attempt his performance. While the failure of either party to procure a bond would operate as a condition subsequent to excuse the other's performance, Gore's performance cannot be converted to a condition precedent to action by Weathersby.

vent the previous year's financial fiasco of having contracted in the spring to sell his crop at a certain price and then having the purchaser renege at harvest time after the price had fallen below that in the contract. The period of a potential breach by a purchaser was the time the cotton was to be picked. All parties were agreed at trial that for any cotton to be picked by July 1 in northern Mississippi would have been incredible. The security provided by the letter of credit therefore would not have prevented loss to Gore if the purchaser refused to pay the contract price at harvest.

Gore's broad right to collect on the letter of credit by presenting to the Union Planters National Bank "a statement signed by Y. B. Gore that the amount drawn under this Letter of Credit is the amount due under the terms of contract between buyer and seller," was without substantial meaning. If prior to July 1 Weathersby had failed to post the required bond, Gore's remedy would have been to demand adequate assurances of due performance or to cancel the contract. Miss.Code Ann. § 75–2–609 (1973). There would have been no "amount due" under the contract. Unless Weathersby had committed some anticipatory breach of contract, a difficult thing to perceive in the case of a forward contract purchaser, there would be no circumstance under which Gore would have been justified in believing he was as secured by this letter of credit as his contract with Weathersby required.

### C. Jury Instructions

By May 14 an otherwise proper performance bond of $25,000 was provided by Weathersby. Before that time Gore had given notice that the contract was cancelled due to what he perceived as Weathersby's

breach. Since no time was stated in the written contract within which the bond was to be provided, Miss.Code Ann. § 75–2–309 (1973) would apply and require that the bond be furnished within a reasonable time. What constitutes a reasonable time is a question of fact to be determined from all the evidence. The jury found that Weathersby had provided adequate security within a reasonable time. However, the jury was not instructed that the time commencing their measure of whether Weathersby acted with reasonable promptness was at the latest March 6, the time that Strong definitely understood the need for a performance bond. Moreover, they were not instructed that the letter of credit could not be considered adequate security.

The guidance given to the jury for weighing the evidence was basically the interrogatory:

> Do you find from a preponderance of the evidence that plaintiff, that is, Mr. Weathersby, failed to substantially comply with the contract for the benefit of defendant and to secure the faithful performance of his contract within a reasonable time after having received notice that such security was required?

The jury was not told that they should consider notice given to Strong as Weathersby's agent as constituting notice to Weathersby. An instruction was requested by Gore that Strong was Weathersby's agent as a matter of law but this was rejected.[5] Therefore no guidance was offered to the jury on this crucial issue. Since Strong was Weathersby's agent, the instruction requested should have been submitted. Though Gore's request that the instruction be submitted was oral and never reduced to writing in accordance with Fed.

---

**5.** The first requested instruction on agency was contained in this statement: "I ask the court to instruct the jury that notice in this case to Mr. Strong of Bluff City Cotton Company for the plaintiff to make a bond as a matter of law constituted notice to the plaintiff . . . ."

When this was rejected by the court, Gore's attorney then stated

    If the Court please, we would like the court to rule and instruct the jury that Bluff City

Cotton Company was the apparent representative, even if they were not in fact the actual representative of Weathersby Cotton Company. And that if the defendant relied upon it in good faith then Weathersby Cotton Company is bound by any communications made by Bluff City Cotton Company in its behalf in any communication made to Bluff City Cotton Company from the defendant.

R.C.P. 51, such deficiency does not bar review of a requested instruction since the court was clearly informed of the point involved. *Dunn v. United States*, 318 F.2d 89, 93 (5th Cir. 1963); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2552 (1971); *see generally, Celanese Corp. of America v. Vandalia Warehouse Corp.*, 424 F.2d 1176, 1181 (7th Cir. 1970); *Marshall v. Isthmian Lines, Inc.*, 334 F.2d 131, 137 n. 13 (5th Cir. 1964). Gore further insisted that the jury should be asked whether Weathersby provided a "bond" within a reasonable time; the interrogatory given used the term "security" instead of "bond" and was objected to by Gore on this ground. Again, the court was adequately informed that Gore insisted that the letter of credit was insufficient. However, the question of reasonable time is a jury question requiring relitigation unless it was established as a matter of law by the evidence.

■ Section 75–2–309(1) of the Mississippi Code states "The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time." According to Comment 6 to Uniform Commercial Code § 2–309,

Parties to a contract are not required in giving reasonable notification to fix, at peril of breach, a time which is in fact reasonable in the unforeseeable judgment of a later trier of fact. Effective communication of a proposed time limit calls for a response, so that failure to reply will make out acquiescence. Where objection is made, however, or if the demand is merely for information as to when goods will be delivered or will be ordered out, demand for assurances on the ground of insecurity may be made under this Article pending further negotiations. Only when a party insists on undue delay or on rejection of the other party's reasonable proposal is there a question of flat breach under the present section.

No reported cases in Mississippi or any other state applying this comment have discovered. However, as stated in J. White & R. Summers, Uniform Commercial Code § 4 at 11 (1972) (footnote omitted), "The Official Comments appended to each section of the 1962 official text of the code are by far the most useful aids to interpretation and construction."

The desire to form a body of commercial law common to all states was expressed by the Mississippi legislature when it adopted the section of the Code stating that the "underlying purposes of and policies of this code are . . . to make uniform the law among the various jurisdictions." Miss. Code Ann. § 75–1–102(2)(c) (1973). Karl Lwewellyn has urged following the guidance of the comments as a principal method of insuring this uniformity. J. White & R. Summers, *supra* at 11. Moreover, the principle behind comment 6 to § 2–309 has seen express adoption in another section of the Code. Under § 75–2–207, an acceptance of an offer is valid even though additional or different terms are stated in the offer. Between merchants, these terms become part of the contract unless the offer expressly limited acceptance to the initial terms, the new terms are materially different from the original ones, or notification of the objection is sent in a timely manner. In the context of comment 6 to UCC § 2–309, the application of the required-response policy here is reasonable as the terms suggested do not alter previously established ones but instead make certain what was previously ambiguous. If the receiving party does not believe the new term is reasonable he can reject it.

We hold that if the Mississippi courts were faced with the issue of adopting comment 6 to UCC § 2–309 they would do so. The comment itself states that "effective communication" is necessary. This includes requirements both that an actual communication of the time limit be made to the other party or his agent, and that the notification be given sufficiently in advance of the deadline specified to permit the party to respond. The time suggested was not too short to permit a response. Weathersby was validly informed through Strong that he must provide a performance bond within two weeks. To avoid this deadline's becoming a fixed part of the contract, Weathersby had to object.

That Weathersby did object is evident from his response to the deadline. During the two-week period Weathersby procured a letter of credit and mailed it to Gore. Notification accompanied the letter of credit that a bond was being prepared and would be made available to Gore later. Though the words are not explicit, they clearly indicate Weathersby was not acquiescing in the time limit proposed. An attempt was made partially to fulfill the demands made by Gore, and in conjunction Weathersby implied that complete performance could not occur within the period established. However, because the requirement and response communications do not answer the fact question of whether Weathersby met the bond requirement within a reasonable time, a new trial is necessary on this issue. If the time within which Weathersby acted was not reasonable, then Gore properly cancelled the contract on May 3.

## II. *Specific Performance*

If on a new trial it is found that Weathersby did act to furnish a performance bond with reasonable promptness, then the issue of whether specific performance of this contract is permissible arises. Sound judicial husbandry indicates we hold now that it is not. The parties are in considerable disagreement over the meaning of Miss.Code

Ann. § 75–2–716(1) (1973): "Specific performance may be decreed where the goods are unique or in other proper circumstances." Various authorities have been cited to the court indicating that crop contracts historically have been treated as susceptible to specific performance treatment more readily than other types of contracts. *E. g.,* Anno., 87 A.L.R.2d 732, 779 (1963); Van Hecke, *Changing Emphases in Specific Performance,* 40 N.C.L.Rev. 1, 4–9 (1961). However, cotton contracts have not been given such treatment in Mississippi when other cotton was readily available on the open market.[6] In *Austin v. Montgomery,* 336 So.2d 745 (Miss.1976), the Mississippi Supreme Court permitted without discussion the specific performance of a cotton output contract that had been entered in March 1973 and breached by the farmer-seller in July. The plaintiff buyer contended that it was impossible to obtain cotton elsewhere when notice was given in July that the farmer would refuse to deliver at harvest. The farmer did not attempt to refute this contention. Consequently the seller would have had to default on his contract to deliver the cotton to a textile mill. Since the parties here are in agreement that other cotton was available when the notice of cancellation was sent in May by Gore,[7] the *Austin* decision is not in point.

6. We also note the express statutory provision permitting an agricultural cooperative marketing association to demand specific performance of a contract. Miss.Code Ann. § 79–19–21 (1972); *see Campbell v. Staple Cotton Cooperative Ass'n,* 334 So.2d 378 (Miss.1976). The statute does not apply in the present suit and forms no part of our decision.

7. During argument by counsel concerning appropriate jury instructions, an offer of proof was made by Gore's attorney that at any time after Gore's notice of cancellation on May 3, substitute cotton contracts could have been purchased. The trial court ruled such evidence inappropriate. After the jury had returned the verdict favorable to Weathersby, a separate colloquy on this issue between the trial court and counsel occurred:

> THE COURT:
> Well, there wouldn't be any issue to that, that he could have gone out on the market and bought the cotton.
> MR. HAWKINS [counsel for Gore]:

> If there is no issue on that, there is no issue, Your Honor.
> THE COURT:
> Do you deny that he could have covered if he had elected to?
> MR. THOMASON [counsel for Weathersby]:
> No, sir, we don't deny that. We don't think he was compelled to cover, however. We think another remedy was available, which was specific performance.
> THE COURT:
> But you would not deny that he could have covered?
> MR. THOMASON:
> No, sir, we would not deny that.
> THE COURT:
> So there would be no issue of fact then for the jury to decide because on that issue you would concede it?
> MR. THOMASON:
> Yes, sir.

Consequently, the question of the availability of cover has been foreclosed.

Far predating Mississippi's adoption of the Uniform Commercial Code, but indicating the reasons why specific performance is not suitable here, is *Scott v. Billgerry*, 40 Miss. 119 (1866). Billgerry was the purchaser of seventy-five bales of cotton from Scott. The purchase price of $3900 was paid at the time the contract was entered. Upon Scott's subsequent refusal to deliver, Billgerry sought specific performance. Though the court was not referring to an output contract but rather to the simple purchase of cotton bales, the language is equally applicable here:

It is altogether immaterial whether there was a sale of certain specific bales of cotton, or an agreement to sell and deliver a certain number of bales out of a particular lot, or a general agreement to sell and deliver a certain number of bales, without any designation of the specific bales, or of the particular lot out of which they are to come. All such cases depend upon the same general principle. The rule is, not to entertain jurisdiction in equity for a specific performance of agreements respecting goods, chattels, stock, choses in action, and other things of a personal nature, unless, under the particular circumstances of the case, there can be no adequate compensation in damages at law.

*Id.* at 140.

The adoption of the Uniform Commercial Code by Mississippi does not suggest the considerations expressed in *Scott v. Billgerry* are now to be rejected. Other than to indicate that the Code is intended to "further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale," the comments accompanying UCC § 2–716 are of little guidance. The comments also state that "[o]utput and requirements contracts involving a particularly or peculiarly available source of market present today the typical commercial specific performance situation," but the interpretation of this language appears to range from suggesting all output contracts should be specifically enforceable to a mere observation that output contracts form a suitable factual background in most cases in which specific performance may be sought.

The general rule applicable when specific performance is requested has been stated in *Roberts v. Spence*, 209 So.2d 623, 626 (Miss.1968): "specific performance of a contract will not be awarded where damages may be recovered and the remedy in a court of law is adequate to compensate the injured party." Considering the reluctance expressed in *Roberts* to authorization of the specific performance remedy, we hold that the Mississippi Supreme Court would apply a restrictive reading of § 75–2–716. A similar interpretation of the Code provision was adopted by the Georgia Supreme Court in *Duval & Co. v. Malcom*, 233 Ga. 784, 214 S.E.2d 356 (1975). There a buyer attempted to get specific performance of a cotton output contract entered into with a cotton farmer. Specific performance was rejected with the statement damages would be sufficient unless cotton could not be obtained in the open market. Thus the Georgia court, as did the Mississippi Supreme Court in *Austin*, would have permitted specific performance if the buyer could not otherwise obtain the needed cotton. Absent this fact, specific performance was not an available remedy. The Georgia court gave considerable attention to the Code language that specific performance should be permitted when goods are unique and "in other proper circumstances." The vague language was held not to authorize wholesale granting of the remedy when output contracts were involved. The remedy of damages—the difference between the market price at the time of the breach and the contract price—adequately compensated the buyer for his inability to procure the cotton from the farmer with whom he had contracted. *Cf. R. L. Kimsey Cotton Co., Inc. v. Ferguson*, 233 Ga. 962, 214 S.E.2d 360 (1975). Likewise Weathersby was adequately protected from any damages occasioned by Gore's breach of the contract, if any occurred. He could have acquired additional cotton on the open market when Gore informed him he would no longer perform under the contract. He did not do so and

thus, if entitled to damages at all, must settle for the difference between the contract and the market price at the time Gore cancelled. *See* Miss.Code Ann. § 75–2–712 (1973).

In summary, the refusal to instruct the jury that Strong was an agent of Weathersby was error; the issue of whether the performance bond was acquired by Weathersby within a reasonable time is still an open question but the letter of credit cannot be considered as fulfilling Weathersby's obligation under the contract. Finally, specific performance was not an appropriate remedy in the present case. If Weathersby is successful in proving that Gore improperly cancelled the contract, he is limited to recovery of damages.[8]

REVERSED AND REMANDED.

---

**8.** A substantial question is raised concerning the correctness of the trial court's refusal to join Starke Taylor and Fieldcrest Mills as parties to this action. Gore's contention that they are indispensible parties under Federal Rule of Civil Procedure 19 need not be answered upon this appeal, however, and we leave the question of joinder of additional parties open for further consideration by the trial court on remand. If that court concludes that joinder is not required, then any obligation that may be imposed upon Gore to compensate Weathersby will certainly be limited to his actual losses and not extend to damages actually suffered by subsequent purchasers of the cotton forward contract who do not choose to join as plaintiffs.